HIGHROCK, Appellant v. GAVIN et al (Gavin and Pratt, Respondents.)

(179 N. W. 13.)

(File No. 4454.   Opinion filed August 25, 1920.   Rehearing denied November 6, 1920.)

1. **Pleadings—Motion for Judgment On, As Conceding Truth of Reply.**

    Where, in a suit to quiet title, the pleadings are composed of complaint, answer, and reply, held, that by defendants' motion for judgment on pleadings, they conceded truth of material allegations in the reply.

2. **Quieting Title—Indian Allotment Lands—Plaintiff as Allottee's Heir, Defense of Title Through Vendee of Alleged Heir, Sale Approved by Secretary of Interior—Judgment Based on Prior Decision, Later Held as Dicta.**

    In a suit to quiet title, plaintiff, claiming as sole heir at law of a deceased Indian allottee under General Allotment Law (Act of Cong. of Feb. 8, 1887,) and that she never sold the land, defendants claiming as subsequent grantees under a sale of the land as that of an alleged heir, which sale was approved by Secretary of Interior; held, that whether trial court rightly or wrongly rendered judgment for defendants, basing its conclusion upon Daugherty v. McFarland, 40 S. D. 1, 166 N. W. 143, which latter case held that, where allottee, under said Allotment Act dies, and thereafter Secretary of Interior approves a deed made by a party or parties claiming to be the heir or heirs at law of deceased allottee, the deed in fact conveys title to such allotment and deprives such heir or heirs of all interests in the allotment, notwithstanding allottee'ss heirs did not consent to or have knowledge of the conveyance, or receive any part of the consideration therefor;—what was so

laid down in the McFarland case was unnecessary and immaterial to the issues there involved and was purely obiter dicta, and not controlling upon this Court or any other court.

3. **Same—Indian Allotments—General Allotment Act, Trust Patent Under, Whether Government Continued Owner, Nature of Trust, Disposal of Title Through Secretary of Interior, Effect— Congressional Authority Over Tribal Indians, Property— Whether Allottment Covered Merely "Tribal Possessory Right."**

Where this Court, in Daugherty v. McFarland, 40 S. D. 1, 166 N. W. 143, laid down the propositions that lands allotted under Act of Cong. of February 8, 1887, known as the General Allotment Law, continued to be government property, that government by its Congress had complete authority over tribal Indians and their property, unaccountable to any other tribunal, that, while it held the property in trust for Indians, the trust differed from the ordinary trust, in that Congress had full authority to make or unmake rules governing execution thereof, and that government could dispose of same through Secretary of Interior, that by approval thereof the deed in question conveyed to grantee fee simple title to the land involved, clear of right of any heirs of deceased, allottee, that rights, if any, of any omitted heirs should follow, not the land, but the fund realized from sale thereof, and that such allotment amounted only to apportionment of "the tribal possessory right," which right is the only one conferred by trust patent; held, that those expressions are based almost wholly upon the holding in United States v. Chase 245 U. S. 89, the facts in which latter case however differed materially from those in the Daugherty case; since, in the Chase case the controversy arose under the Treaty of 1865, which provided (Art. 4) in part that division and assignments of lands to the Omahas in severalty·shall be made under direction of Secretary of the Interior, and when approved by him shall be final and conclusive, that the tracts shall not be alienated, etc., and shall be exempt from taxation, etc., until otherwise provided by Congress; the assignee of an allotment having gone into possession, and, after her death, another Indian, succeeding to her rights, being in possession, Act of Cong., August 7, 1882, (which act was adopted by tribal vote) authorizing members of the tribe to take land in severalty by "allotment," in lieu of assignments previously made under said treaty; which act of 1882 provided for "trust patents," and for full patents conveying the fee at the end of a 25 year period; under which act an Indian other than him in possession received trust patent to a part of same; the court holding that the allotment under the Act of 1882 took precedence over the assignment under the treaty; this on the ground (1) that while

assignments under the treaty specified that the tracts assigned are for exclusive use of assignees, "their heirs and decedents," and that the tract shall not be "alienated in fee, leased or otherwise disposed of except to the United States or to other members of the tribe," which provisions were held to be consistent with apportionment of "the Indian possessory right, leaving the fee in the United States as before;" that the approved assignments could operate as conclusive apportionment of that right without affecting the fee, a right of occupancy passing to heirs without decedent being invested with the fee; that the assignees took only possessory right being further evidenced by a provision contained in the issued assignments, providing that the government will hold title thereto in trust so long as assignee's occupancy continued; and (2) that the act of 1882 contemplated abrogation of all rights under said treaty, allotments by trust patents being substituted therefor. Conceding that the foregoing and other expressed reasons supported the conclusions reached by the Court in the Chase case, they have no application to the facts in the McFarland case, since under the act of February 8, 1887, the parties contracted for fee simple title in the first instance (Parr v. U. S., 153 Fed. 462.) Sec. 5, Ch. 119, 24 Stat., as amended by Sec. 11, Ch. 405, 25 Stat., being the act under which allotment in the case was made, containing the provision that upon approval of allotments therein provided for by Secretary of the Interior he shall cause patents to issue which shall be of legal effect and declare that the United States holds the allotted lands in trust, etc., for benefit of the allottee, or, in case of his decease, of his heirs, the land to be conveyed by patent in fee at end of trust period; the trust patent containing among others the provision that the patentee shall hold the land "discharged of said trust and free of all charge or incumbrances whatsoever."

4.  **Indians—Allotment Lands, Trust Patent Under 1889 Act—Government Holding for Indian's Benefit, His Heirs, Whether Granting Mere "Tribal, Possessory Right"—Allottee's Right Regardless of Occupancy or Improvements—Heirs, How They Take—Homesteads, Etc., Distinguished.**

A so-called trust patent issued under Sec. 5, Ch. 119, 24 Stat. as amended by Sec. 11, Ch. 405, 25 stat., which recites it is issued pursuant to Sec. 11, Act of Cong. of 2nd March 1889, and that United States will hold in trust for 25 years the land thus allotted for sole use and benefit of the Indian grantee, or in case of his decease, for sole use of his heirs, etc., and that at the end of said period will convey same by patent to said Indian or his heirs, in fee, discharged of the trust, etc., does not grant merely a "tribal possessory right," nor a mere right of occupancy, but grants an equitable title to the land with an

unconditional agreement by government to convey legal title at end of trust period; by which instrument the government pledged itself to convey to allottee, a fee simple title, free from all "charges or incumbrances;" by which so-called trust patent the tribal possessory right to the tract of land therein described became extinguished, the tribe as such having no further interest in, or control over it, the land being thereby segregated from other portions of the Reservation and from the public domain; the real ownership during trust period, with right to fee simple title thereafter having passed to grantee; and save as to restriction upon alienation during trust period, allottee's right is unconditional; he may, but is not required to occupy, improve or fence it; which right a court of equity will recognize and protect. Moreover, upon his death his heirs become substituted for allottee with same rights of enjoyment, but with restriction upon alienation removed, and may immediately sell the land, and patent at end of trust period issues direct to them; such allottee takes an inheritable estate under trust patent, his heirs acquire title by inheritance; such being the understanding of Congress under Secs. 1 and 2, Act of January 25, 1910, (Chap. 431, 36 Stat. at Large;) which act authorized allottees who are over age to dispose of allotments by will, thus recognizing the estate as inheritable; contrary to case of homesteaders, preemptors, or timber culture entrymen dying before completion of residence or improvements, and whose heirs may complete residence or improvements, patent then issuing to them; such heirs acquiring their title by direct grant from government, not by inheritance from deceased entryman; the effect however being the same, however they take title, except that the heirs take allotments freed from restrictions upon alienation existing during life of allottee, and may sell and pass title to land prior to expiration of trust period, upon approval of deed by Secretary of Interior.

5. **Same—Distribution of Deceased Allottee's Estate, Subsequent Partition Proceedings, Secretary's Approval—No Jurisdiction in County Court, Acquiescence by Heirs, Effect, Waiver, Estoppel, Thereby—Partitionees' Deed, Secretary's Approval, Effect as Terminating Federal Jurisdiction—Dicta in McFarland Case.**

In the McFarland case, supra, title was derived through Indian allottee, who at death was seized either as original allottee, or by inheritance from other allottees, of land held under so-called trust patent. County court assumed to administer the estate, decreed distribution to widow and children; thereafter decree of county court was entered partitioning the lands among said heirs, copy of the decree being filed in Indian office, such distribution being adopted by Secretary of Interior,

who treated such awards as separate property of individual heirs. **Held,** county court was without jurisdiction of the estate; but, each heir acquiescing therein, and accepting the land so awarded as his full share, thereby.respectively waived rights to shares awarded other heirs, and estopped themselves from claiming same; and when the widow and children thereafter sold their respective tracts by deeds, approved by Secretary of Interior, such approval terminated jurisdiction of United States over the particular tract; and, there being no third party having outstanding interests therein, widow's deed vested good title in her grantee. Moreover, after Secretary's approval of deed, a partition suit was brought in circuit court, to which all heirs were parties and entered appearance, each consenting to the division of the estate theretofore made by county court, a decree in partition being entered accordingly; which circuit court had jurisdiction over all parties and over subject matter theretofore sold with approval of the Secretary of the Initerior, including the land there in controversy, and judgment in that action was final against the other heirs ,and their grantees, and extinguished any claim they might theretofore have asserted; said judgment curing any apparent defect that may have theretofore existed in the title. Because of the facts thus appearing the conclusion of this Court was right, and did full justice to all parties; and it was unnecessary to therein announce, as a general proposition of law, that mere approval by Secretary of Interior of a deed executed by one claiming to be sole heir of deceased allottee, even though stranger to the title, conveys the allotment together with the equitable title of lawful heir, to grantee named in such deed, thus depriving allottee's lawful heirs of their inheritance. Such is not the law.

6. **Same—Allottee's Heir—Title in Trust in Government, Heir's Right to Sell—Secretary's Approval Under Mistake Regarding Heirs, Effect Extinguishing Government Title, Jurisdiction, Vesting Title in Grantee, Subject to True Heir's Right—Such Grantee as Trustee of True Heir.**

   Where plaintiff's Indian allottee son died, she thereby became vested with all his rights,. government still holding legal title in trust for her; as allottee's heir she could sell at pleasure; but, the secretary's approval of her deed under mistaken belief that it was executed by rightful heir, yet resulted in extinguishing Government's title to and jurisdiction over the land, and in vesting legal title in her grantee's name, but subject to equitable rights of allottee's true heir; and such grantee of the non-heir became trustee of an involuntary or constructive trust in favor of true heir; and, it not being shown or claimed that she ever sold or alienated it, she is still equitable owner.

7. **Indian · Affairs—Indian Allotments, Rules Re Disposition Of—Secretary's Right "To Make or Unmake" Rules, Limition of Authority to Approval of Deeds Executed by Actual Owner, and Receipt of Fair Price.**

While, in regular disposal of Indian allotment lands, Secretary of Interior may be authorized "to make or unmake" rules governing disposition thereof, he is not authorized to make or enforce a rule depriving allottee, or heirs, of land already allotted to him by trust patent under allotment law of 1887, nor to sell such land, nor compel or require allottee or heirs to sell it; his authority being limited to approval of deeds already executed by the owner; and while he may supervise the sale, this is solely for purpose of conserving Indian's interest and seeing that he receives a fair price, and not for purpose of seeing that purchaser receives good title.

8. **Same—Act of Congress of June 23, 1910, Non-application Of As Subsequent Legislation.**

Since Act of Cong. of June 23, 1910, (36 Stat. 855,) was not passed until after jurisdiction of United States over land in question had terminated, its provisions are immaterial.

9. **Conveyances—Indian Allotment Deed by Wrongful Claimant as Heir, Subsequent Grantee, Whether Innocent Purchaser—Bare Legal Title Only Conveyed.**

Where plaintiff in suit to quiet title claims as subsequent grantee of an Indian wrongfully claiming to be heir at law of deceased Indian allottee, a subsequent grantee of such patentee is not an innocent purchaser. So held, where Secretary of Interior mistakenly approved a deed by such wrongful claimant, who had never been adjudicated to be heir at law of deceased allottee, defendants, claiming thereunder, admitting he was not such heir; and such deed conveyed nothing but bare legal title, and plaintiff, the true heir, is entitled to judgment establishing title and ownership in her.

McCoy, P. J., and Smith and Whiting, JJ., concurring specially.

Gates, J., dissenting.

Appeal from Circuit Court, Charles Mix County. Hon. Rorert B. Tripp, Judge.

Action by Mary Highrock, against John P. Gavin and others, to quiet title to realty. From a judgment for defendants, and from an order denying a new trial, plaintiff appeals. Reversed.

*E. E. Wagner,* and *G. M. Caster,* for Appellant.

*A. B. Beck,* for Respondent.

(2)    Under point two of the opinion, Appellant submitted that:

It was the intention of Congress by the General Allotment Act to give to the allottee a vested substantial and individual property interest in allotted land.

This court in the Daugherty case, in speaking of the decision of the United States Supreme Court in the Chase case, says: "It was held that assignments of land under the Omaha treaty of 1865 amounted only to an apportionment of the tribal possessory right. We are of the view that the reasoning of the latter opinion is applicable to the allotment in question." Herein lies this Court's most serious error in the Daugherty case.

Respondent cited: Dougherty v. McFarland et al (S. D.) 166, N. W. 143.

(4)    To point four, Respondents cited: Minder v. First Nat'l Bank, 22 S. D. 14 114 N. W. 1090; Reservation State Bank v. Holst, 17 S. D. 240, 59 N. W. 931; U. S. v. Leslie, 167 Fed 670.

(6)    To point six, Respondents cited: United States v. Rickert 47 L. Ed. 533; United States v. Gardner, 133 Fed. 285; Sec. 7 of the Act of Congress of May 27, 1902.

(7)    To point seven, Appellant cited: Garfield v. United States ex rel, Goldsby, 211 U. S. 249; Gritts v. Fisher, 224 U. S. 640.

Respondents cited: United States v. Thurston, 74, C. C. A. 425, 143 Fed. 287; Nat. Bank of Commerce v. Anderson, 77 C. C. A. 259, 147 Fed. 87.

POLLEY, J.   This action was brought for the purpose of determining adverse claims to 80 acres of land in Charles Mix county. Plaintiff in her complaint alleges that she is the owner of said land and asks that title thereto be quieted in her.

Defendants, by way of defense and counterclaim to plaintiff's complaint, allege that the land in question had been alloted to one Paul Gondrow, a member of the Yankton Band of Sioux Indians, by a so-called trust patent issued by the government of the United States, pursuant to Act of Congress approved February 8, 1887, c. 119, 24 Stat. 388, known as the General Allotment Law, and which patent bears date November 24, 1894; that said allottee died within the trust period named in said trust patent, and that thereafter said land was sold to defendants' grantors on the 23d

day of November, 1904, by a person who was found by the Secretary of the Interior to be the sole heir at law of said Paul Gondrow, and which sale was approved by the Secretary of the Interior on the 11th day of February, 1905.

[1]   To this defense plaintiff interposed a reply, wherein she alleged that she is the mother, and the sole heir at law, of the said Paul Gondrow; that under the provisions of said allotment act, and the laws of this state, she inherited the said allotment upon the death of the said Paul Gondrow; that she had never sold nor consented to the sale of the said land, but that she is now the owner thereof. When the case was called for trial, defendants moved for judgment on the pleadings. By this motion defendants concede the truth of the material allegations in the reply, to-wit: That plaintiff is the sole heir at law of the said allottee, that she inherited and became the owner of the said allotment upon the death of the said allottee, and that she had never sold nor in any manner divested herself of the title to the said allotment. But, notwithstanding the admission of these facts, the trial court granted the motion, and entered judgment dismissing plaintiff's complaint, and quieted title to said land in the defendant John P. Gavin. From this judgment plaintiff appeals.

The conclusion reached by the trial court is based wholly upon what was said by this court in Daugherty v. McFarland, 40 S. D. 1, 166 N. W. 143. In that case this court laid down the broad general proposition that, where an allottee under the General Allotment Act dies, and thereafter the Secretary of the Interior approves a deed made by a party or parties claiming to be the heir or heirs at law of the deceased allottee, which deed purports to convey the allotment, such deed does in fact convey title to such allotment to the grantee named in said deed, and thereby deprives such heir or heirs of all interest in and right to said allotment; and this, too, notwithstanding the fact that said heirs of the allottee did not consent to such conveyance, have any knowledge thereof, or receive any part of the consideration therefor. This proposition of law appellant now contends is erroneous, and we are asked to overrule the same.

[2]   Whether said proposition of law is right or wrong, it was certainly unnecessary and immaterial to any of the issues involved in that case. It was therefore pure obliter dicta, and not

controlling upon this or any other court. In the opinion in that case it is said:

"From the various acts of Congress, and from the interpretations thereof by the many decisions of the Supreme Court of the United States, we are of the opinion that the lands allotted under the act of February 8, 1887, continued to be government property; that the government, by its Congress, had complete authority over tribal Indians, and over the property, real or personal, committed to them, unaccountable to any other body or tribunal; that, while it held the property in trust for the Indians, such trust differed from the ordinary trust, in that Congress had full authority to make or unmake the rules governing the execution of the trust; that the federal government could dispose of such property through the agency of the Secretary of the Interior; that by the approval of the deed in question it did convey to August Lahr the fee-simple title to the whole of the tract involved, free and clear of the rights of any heirs of Goodcloud or of Iron Soldier; and that the rights, if any, of such omitted heirs, should not follow the land, but should follow the fund realized upon the sale. United States v. Thurston County, 74 C. C. A. 425, 143 Fed. 287; Nat. Bank of Commerce v. Anderson, 77 C. C. A. 259, 147 Fed. 87."

[3] And it is further said in that case that the allotment under the General Allotment Law "amounted only to an apportionment of the tribal possessory right," and again, "such possessory right must be the only right given by the so-called trust patent." These expressions are based largely, if not wholly, upon what was said by the Supreme Court in United States v. Chase, 245 U. S. 89, 38 Sup. Ct. 24, 62 L. ed. 168. But an examination of that case will show that the facts in that case were so different from the facts in the Daugherty Case that what was said in the former has no application to the facts in the latter. In United States v. Chase the controversy grew out of an assignment of a tract of land made under the treaty of 1865 by the United States government and the Omaha Tribe of Indians. 14 Stat. 667. That treaty made provision for the assignment in severalty of specified and limited tracts of land to the individual Indian. Article 4 of said treaty contains the following provision:

"Said division and assignment of lands to the Omahas in severalty shall be made under the direction of the Secretary of the

Interior, and, when approved by him shall be final and conclusive. Certificates shall be issued by the Commissioner of Indian Affairs for the tracts so assigned, specifying the names of the individuals to whom they have been assigned respectively, and that they are for the exclusive use and benefit of themselves, their heirs, and descendants; and said tracts shall not be alienated in fee, leased, or otherwise disposed of except to the United States or to other members of the tribe, under such rules and regulations as may be prescribed by the Secretary of the Interior, and they shall be exempt from taxation, levy, sale, or forfeiture, until otherwise provided by Congress."

Under this provision of the treaty, members of the tribe, including defendants' predecessor in interest, received an assignment of 160 acres of land. The assignee went into possession of the land assigned, and afterwards died, and the defendant succeeded to her rights under the assignment. While defendant was in the occupation of the said tract of land, Congress passed a law (Act Cong. August 7, 1882, c. 434, 22 Stat. 341, which was accepted and adopted by a vote of the tribe) authorizing the members of the Omaha Tribe of Indians to take land in severalty by "allotment," which allotments were to be taken in lieu of the assignments that had been made under the treaty of 1865. The sixth section of this act provided for the issuance of trust patents covering a period of 25 years, and for full patents conveying the fee at the end of that period. Under this act an Indian, other than the defendant, received a trust patent to an allotment of a tract of land, which included 40 acres of the tract of land that was occupied by the defendant under the assignment made under the treaty of 1865. The action was brought for the purpose of determining who was entitled to this 40 acres of land. The court held that the allotment under the act of 1882 took precedence over the assignment made under the treaty of 1865. This con clusion is based upon two separate grounds. The first of these grounds is:

That while the assignments under the treaty specified that "the tracts assigned are for the exclusive use and benefit of the assignees, 'their heirs and descendants,' and that the tracts shall not be alienated in fee, leased, or otherwise disposed of except to the United States or to other members of the tribe," that "as applied to the situation then in hand these provisions are consistent

with a purpose to apportion the Indian possessory right, leaving the fee in the United States as before."

The court further says:

"The assignments, when approved, could well operate as a final and conclusive apportionment of that right without affecting the fee; and the right of each assignee to occupy and use the tract assigned to him, to the exclusion of other members, could well pass to his heirs and descendants, upon his death, without his being invested with the fee. If not invested with it, he of course could not alienate it, and a cautious provision intended to prevent him from attempting to do so hardly would enlarge his right. True, the provision says, 'except to the United States or to other members of the tribe;' but, as the restriction is also directed against leasing or other disposal, it is not improbable that the real purpose of the excepting clause is to qualify this part of the restriction. In any event, the implication attributed to the provision is too uncertain to afford a substantial basis for thinking the assignee was to take the fee. Other provisions and considerations suggest that an apportionment of the tribal possessory right is all that was intended."

That it was understood that the assignees took only a possessory right under the assignments is further evidenced by the following provision contained in the assignments that were issued to the assignees:

"The said [assignee] is entitled to and may take immediate possession of said land and occupy the same, and the United States guarantees such possession, and will hold the title thereto in trust for the exclusive use and benefit of [the assignee], and * * * heirs so long as such occupancy shall continue."

This clause clearly indicates that a right of occupancy was all that was intended to be conveyed.

The other ground upon which the decision is based is that the act of 1882 contemplated the abrogation of all rights acquired under the treaty of 1865, and that in lieu of the assignments made under that treaty the assignees were to have allotments evidenced by trust patents which provided for a patent in fee at the end of the trust period.

"All rights under the assignments, as such, were to be extinguished, and each assignee was to have the same right to take an allotment as was accorded to other members, but with a

preferred right to make his selection in such a way that his allotment would include his improvements."

And in conclusion the court says:

"Concluding, as we do, that the assignment to Clarissa Chase passed only the Indian or tribal right of occupancy, the remaining question is not difficult of solution. She took that right as it was held by the tribe, without enlargement or dimunition. It was merely individualized. Upon her death, in 1875, it passed to the defendant, he being her sole heir. The act of 1882, consented to by the tribe, put into effect a general plan of allotment, which completely displaced the Indian right of occupancy, and in that sense terminated all right under the assignment. Under that plan the assigned tract was available for allotments, and the defendant was entitled to an allotment. He could select the assigned tract for his allotment indeed he had a preferred right to do so. He could exercise that right, or waive it and select other lands. But he could not select other lands and also hold the assigned tract. He was entitled to one allotment, not two. If not selected by him, the tract in question would be open to selection by another. He does not assert that he selected it, or that he was denied the right to do so, or that he received less than a full allotment without this tract; but he claims that the assignment passed the title in fee, and in consequence was an insurmounable obstacle to the allotment of the tract under the Act of 1882. This claim, as has been shown, is untenable. All that passed by the assignment was a possessory right, and this was terminated by the act of 1882."

Conceding that the foregoing reasons support the conclusions reached by the court in that case, they have no application to the facts in Daugherty v. McFarland, because under the act of February 8, 1887, the parties were contracting for a fee-simple title in the first instance. Parr v. United States (C. C.) 153 Fed. 462. Section 5, c. 119, 24 Stat. 389, Act Cong. Feb. 8, 1887, as amended by section 11, c. 405, 25 Stat. 891, Act Cong. March 2, 1889 (U. S. Comp. St. § 4201), being the act under which the allotment in that case was made, contains the following provisions:

"That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees, which patents shall be of the legal effect, and declare that the United States does and

will hold the lands thus allotted for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs, as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever, and patents shall issue accordingly; * * * Provided, further, that the law of descent and partition in force in the state or territory where the lands may be situated shall apply thereto after patents therefor have been executed and delivered."

Pursuant to said section, the Secretary of the Interior issued to Indians, whose selections he had approved, trust patents which contained the following provisions:

"Now, know ye that the United States of America, in consideration of the premises and in accordance with the provisions of the eleventh section of said act of Congress of the 2d March, 1889, hereby declares that it does and will hold the land thus allotted (subject to all the restrictions and conditions contained in said eleventh section) for the period of twenty-five years in trust, for the sole use and benefit of the said Indian, or, in case of his decease, for the sole use of his heirs according to laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian or his heirs, as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever: Provided that the President of the United States may, in his discretion, extend the said period by a term not exceeding ten years; and if any lease or conveyance shall be made of said lands, or contract made touching the same before the expiration of the time above mentioned, such lease or conveyance or contract shall be absolutely null and void."

[4] This is not a grant of a "tribal possessory right," nor a mere right of occupancy. This is a grant of the equitable title to the land described, with an unconditional agreement by the government of the United States to convey the legal title at the expiration of the trust period. Hollowell v. Commons, 210 Fed. 793, 127 C. C. A. 343; McKay v. Kalyton, 204 U. S. 458, 27 Sup. Ct. 346, 51 L. ed. 566. By this instrument, no matter by

what name it may be called, the government of the United States pledged itself in the most solemn manner to convey to the allottee a fee-simple title, free from all "charges or incumbrances of any kind whatsoever." By the issuance of this so-called trust patent the tribal possessory right to the tract of land therein described became extinguished. The tribe, as such, had no further interest in or control over said tract. So far as the tribe is concerned, that particular tract is reduced to private ownership. Said tract of land is absolutely segregated from all other portions of the reservation and from the public domain. While the government retains the legal title and jurisdiction over the land during the trust period, the real ownership, together with the absolute right to a fee-simple title at the end of the trust period, has passed to the grantee. Except as to the restriction upon the alienation of the land during the trust period, the right of the allottee is absolutely unconditional. He may live upon the land or cultivate it, if he so desires; but he is not required to occupy it, nor to improve it, nor to inclose it with a fence. He need never set foot upon it, if he is not so disposed. He has only to wait until the expiration of the trust period, when he has an unqualified right to a fee-simple title, free from all restrictions of every kind or character.

This right is a valuable property right, and a right that any court of equity would recognize and protect. While this is true of the allottee, his heirs, upon his death, take a still more valuable right, because, upon the death of the allottee, his heirs become substituted for the allottee, and have the same rights in the allotment that were enjoyed by him, but with the restriction upon the alienation removed. They may at once sell the land, or they may wait until the expiration of the trust period, and the patent from the government will issue directly to them. It is held by the federal courts that the allottee takes an inheritable estate under his trust patent and that his heirs acquire their title by inheritance. In Parr v. U. S., supra, where the question was under consideration, it was held that the heirs take their title by inheritance, and that this was the understanding of Congress is made perfectly clear by the language used in sections 1 and 2 of the Act of Congress approved June 25, 1910 (chapter 431, 36 Statutes at Large, 855 [U. S. Comp. St. §§ 4226, 4228]). This act not only refers to allotments of deceased allottees as inherited lands,

but authorizes allottees who are over 21 years of age to dispose of their allotments by will, clearly recognizing the estate as inheritable. On the other hand, where homesteaders, pre-emptors, or timber culture entrymen have died before completing their required residence or improvements, and the heirs of such entrymen are allowed to complete such residence or improvements, the patent then issues to such heirs. In such cases, it is held that the heirs acquire their title by direct grant from the government, and not by inheritance from the deceased entryman. Aspey v. Barry, 13 S. D. 221, 83 N. W. 91; Gould v. Tucker, 20 S. D 226, 105 N. W. 624; Rogers v. Clemens, 26 Kan. 522; Cooper v. Wilder, 111 Cal. 191, 43 Pac. 591, 52 Am. St. Rep. 163; Towner v. Rodegeb, 33 Wash. 153, 74 Pac. 50, 99 Am. St. Rep. 936; Gjerstadengen v. Van Duzen, 7 N. D. 612, 76 N. W. 233, 66 Am. St. Rep. 679; Hall v. Russel, 101 U. S. 503, 25 L. ed. 829; Herschbergen v. Blewitt (C. C.) 53 Fed. 170.

The effect, however, is the same, whether they take title by inheritance or by direct grant from the government, except that under the law the heirs take the allotment freed from restrictions upon alienation that had existed during the life of the allottee, and are authorized to sell the land prior to the expiration of the trust period and pass the title by deed. True, the deed cannot take effect until it is approved by the Secretary of the Interior; but upon such approval title in fee vests in the grantee named in the deed. In McKay v. Kalyton, supra, the Supreme Court of the United States said:

"The suggestion made in the argument that the controversy here presented involved the mere possession, and not the title, * * * is without merit, since the right of possession asserted of necessity is dependent upon the existence of an equitable title in the claimant under the legislation of Congress to the ownership of the allotted lands."

The title to the property in controversy in that case was based upon a trust patent identical in language and meaning with the one involved in Daugherty v. McFarland and in the case at bar. The above expression clearly indicates the views of that court upon the force and effect of the so-called trust patents. Neither was this expression retracted or in any wise modified by anything that was said in United States v. Chase, because in the latter case

the rights involved were based on a different contract under different provisions of law.

[5] With the above principles in mind, let us review the facts relating to the land involved in Daugherty v. McFarland. Title to the land involved was derived from Iron Soldier, who at the time of his death, was seized, either as original allottee, or by inheritance from other allottees, of 480 acres of land which he was holding under so-called trust patents. When he died, he left surviving him his wife, Ptesanwin, and four children, as heirs at law. Shortly after his death, the county court of Charles Mix county undertook to administer the estate, and such proceedings were had that a decree of distribution was entered which awarded to the widow an undivided one-third of the estate and to the four children an undivided one-sixth each. These distributive shares were the equivalent of 160 acres of land to Ptesanwin and 80 acres each to the children. Further proceedings in the county court were had, to the end that a decree was entered, whereby the estate was partitioned among the heirs. The widow was given 160 acres of land in entirety, and each of the children 80 acres in entirety. A copy of this decree was filed in the Indian Office at Washington, and was adopted by the Secretary of the Interior as a proper and fair division of the estate, and the several tracts that were awarded to the individual heirs by this decree were treated by the Secretary of the Interior as the separate and individual property of the individual heirs.

The county court was without jurisdiction of the estate, and of course the various decrees entered therein were without any legal effect; but the distribution and partition attempted to be made were acquiesced in by the heirs, respectively, and each of them accepted the land awarded to him by said decree as his full share of the estate. Of course, in accepting the quantity of land awarded to the individual heirs as their full share of the estate, they waived all rights to the shares that had been awarded to other heirs, and estopped themselves from maintaining any claim against those shares. The tract of land involved in the suit was awarded to Ptesanwin and accepted by her as a part of her share of the estate. While the above condition existed, Ptesanwin sold said land to McFarland's grantor by a deed that was approved by the Secretary of the Interior. Two of the children sold their separate tracts by deeds; and these deeds were approved by the

Secretary of the Interior.  Whether the separate tracts awarded to the other two children were sold is left in doubt by the record; nor is it material.  The first effect of the approval by the Secretary of the Interior of Ptesanwin's deed to McFarland's grantor was to terminate the jurisdiction of the United States over that particular tract of land.  Egan v. McDonald, 36 S. D. 92, 153 N. W. 915.  The second effect was to convey a prima facie title that was good until some one else showed that he had a better title.  Tripp v. Sieler, 38 S. D. 321, 161 N. W. 337.  As it was shown that there was no third party who had any outstanding interest in the land or could maintain a claim against the same, Ptesanwin's deed vested an absolutely good title in her grantee. But this was not all.  After Ptesanwin's deed had been executed and approved by the Secretary of the Interior, a partition suit was brought in the circuit court of Charles Mix county for the purpose of partitioning Iron Soldier's estate among his heirs.  All the heirs were made parties to the suit and all entered an appearance therein.  Each consented to the division of the estate as it had been made by the county court, and a decree in partition was entered in the case, which awarded to Ptesanwin the land she had sold to McFarland's grantor

The court had jurisdiction over all the parties to the action and of that portion of the subject-matter that had been sold with the approval of the Secretary of the Interior.  This included the land in controversy.  Therefore the judgment in that action was final as against the other heirs and their grantees, and extinguished any claim they might theretofore have asserted against that portion of the estate.  In other words, that judgment cured any apparent defect that may have existed in the title up to that time. Because of the facts and circumstances that were shown to exist in that case, the conclusion reached by this court was right, and did full justice to all parties in interest.  And it was wholly unnecessary to announce, as a general proposition of law, that the mere approval by the Secretary of the Interior of a deed executed by a party claiming to be sole heir of a deceased allottee, even though a stranger to the title, will convey the title to the allotment together with the equitable title of the lawful heir, to the grantee named in such deed, and thus deprive the lawful heirs of the allottee of their inheritance.  Such is not the law.

[6]   In the case at bar, when plaintiff's son died, she at once

became vested with all the rights he had possessed. The government still held the legal title to the land, but in trust for her. As heir of the allottee she had a right to sell it at her pleasure. When the Secretary of the Interior approved the deed purporting to convey this land to defendant's grantor, he did it under the mistaken belief that the deed had been executed by the rightful heir. The result of his approval was to extinguish the government's title and the government's jurisdiction over the land, and to vest the legal title in the grantee named in the deed, but subject to the equitable rights of plaintiff as heir of the original allottee. The grantee therefore became the trustee of an involuntary or constructive trust in favor of plaintiff as the equitable owner of the land.

[7, 8] While the Secretary of the Interior may be authorized to "make or unmake" rules governing the disposition of allotted Indian lands, he has no authority to make or enforce any rule that would deprive any allottee, or the heirs of any deceased allottee, of land that had been allotted to him by trust patent, issued pursuant to the Allotment Law of 1887. He is not authorized to sell such land, nor to compel nor require the allottee or his heirs to sell it. The extent of his authority is to approve deeds that have already been executed by the owner of the land; but, as it was said Mr. Justice Brewer, in Richardville v. Thorp (C. C.) 28 Fed. 52, and approved by the Supreme Court of the United States in Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. ed. 49, the Secretary of the Interior "had no judicial power to adjudge a forfeiture, to decide questions of inheritance, or to divest the owner of his title without his knowledge or consent." He is given power to supervise the sale, but this is solely for the purpose of looking after the interest of the Indian and seeing that the Indian receives a fair price for his land, and not for the purpose of seeing that the purchaser receives a good title for his money.

As was said above, when Paul Gondrow died, plaintiff, as his sole heir at law, became the owner of the land under the law then in force. She had the right to sell it, if she so desired; but she also had the right to keep it. She chose to exercise the latter option, and as it is not shown nor claimed that she ever sold or otherwise alienated it, she is still the equitable owner thereof. Frequent reference is made in respondents' brief to the provision

of the Act of Congress approved June 25, 1910 (36 Stat. 855;)
but as that act was not passed until after the jurisdiction of the
United States over the land in question had terminated we are
not concerned with its provisions.

[9]  Defendants are not in the position of innocent purchas-
ers.  They have been dealing with a tract of land that was
allotted to Paul Gondrow.  After his death, defendants' grant-
ors took a deed, purporting to convey title to said allotment, from
one Mazar Gondrow; but there was nothing in the record to show
that Mazar Gondrow ever purchased or otherwise acquired title
to said tract of land or had any rights whatever therein.  The
defendants and their immediate grantors base all their rights on the
one fact that the Secretary of the Interior approved the deed
from Mazar Gondrow, who had never been adjudged to be the
heir at law of Paul Gondrow, and it is admitted by the defendants
that he was not such heir; therefore, by their own admission,
they are claiming through a purported conveyance from a party
who had no title to the land.  Such conveyance conveyed nothing
but the bare legal title, and plaintiff is entitled to judgment as
prayed for in her complaint.

The judgment appealed from is reversed.

WHITING, J. (concurring.)  I concur in the conclusion
reached by Judge POLLEY, and, in view of the importance of the
questions involved and of the fact that we reversing a former
holding of this court, I feel justified in discussing at some con-
siderable length the reasons for my present conclusions.  After a
most careful study of many authorities, and, I think, a reading of
practically every statute upon which the holdings therein are
based, I have reached the conclusion that my former views, in
harmony with former decisions of this court, were, in some im-
portant particulars, erroneous.  I am of the opinion that this
court was absolutely in error when, in the Daugherty Case, we
held that, by the approval of the Secretary of the Interior of a
deed given by one of several heirs of an allottee, but purporting
to convey the whole estate in the land, the fee-simple title to the
whole of the tract involved was conveyed free and clear of the
rights of any of the other heirs of such allottee.

Any lawyer called upon to construe section 5 of the act of
1887 as well as the similar sections in the acts of 1882 and 1885
(Act Cong. March 3, 1885, c. 319, 23 Stat. 340), if free from any

impression as to what constructions courts had given such sections, would declare that these sections authorize the allotment in severalty of lands to Indians, and that, by such an allotment, the full equitable fee-simple estate, subject to restrictions as to alienation, would pass to the allottee. Likewise any lawyer called upon to construe Act May 27, 1902, c. 888, 32 Stat. 245, if free from any impression as to how courts had construed it, would reach the conclusion that no act of the Secretary of the Interior could have any further effect than to approve of and thus validate the act of the grantor so that his deed would (a) convey such estate, and only such estate, as the grantor was possessed of, and, (b) pass the legal title to such estate.

I concurred in the Daugherty Case because I was then of the opinion that the federal courts had construed the above statutes in line with the holding therein; but, after a more careful study of the authorities bearing upon the questions presented on this appeal, I feel no hesitancy in declaring that no authority can be found, outside of our own decisions, that places any other construction upon such statutes than I have noted above. There may be cases which, at first blush, seem to hold otherwise; but I am convinced that a careful consideration of same, in the light of the particular statute under consideration, will sustain my conclusion.

The act of 1887 does not contain any word or provision that can properly be construed as giving to the Secretary of the Interior any power whatsoever to determine who are any who are not heirs of a deceased allottee, and there never was any amendment, until the act of 1910, that gave any such power. I am convinced that this court has been in error in what it has held regarding: (a) The estate that vests in the allottee. (b) The estate that passes to the heir of the allottee. (c) The effect of the approval of a deed by the Secretary of the Interior, where the Indian grantor had neither no, or at most but a partial, interest or estate in the land described in the deed.

While it is true that the courts hold that the only right of which the allottee has the immediate benefit is that of use and occupancy, yet they recognize that such right rests upon an estate which he has received through the so-called patent. In McKay v. Kalyton, 204 U. S. 458, 27 Sup. Ct. 346, 51 L. Ed. 566, it was directly held that the allottee has an equitable estate upon which his right of possession rests. In Hallowell v. Commons, 210 Fed. 793,

127 C. C. A. 343, it was held that under the act of 1882 (which was similar in wording to the act of 1887), the equitable interest, subject to restrictions contained in the statute, passed to the allottee, while the legal title was retained by the government. In the case of Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. Ed. 49, which contains an exhaustive discussion of what estate or title an allottee gets by virtue of a treaty wherein and whereunder there is segregated and set apart to the individual a separate tract of land, it was held that, while the lands are in possession of the tribes *as tribes,* the individual Indian has merely a right of occupancy—the right to use and enjoy the lands in common with the United States—until such time as there shall be a partition and segregation; but it was also held in that case that where, under the terms of a treaty, certain fixed amounts of land were selected by Indians as their individual property, the effect of such segregation was to vest in each allottee the fee-simple title to his particular tract of land, giving the allottee the full right of alienation, subject, of course, to such control over alienation as the government, through Congress, has over its Indian wards. After reviewing a vast number of authorities, the court finally says:

"The clear result of this series of decisions is that, when the United States, in a treaty with an Indian tribe and as a part of the consideration for the cession by the tribe of a tract of country to the United States, makes a reservation to a chief or other member of a tribe of a specified number of sections of land, whether already identified, or to be surveyed and located in the future, the *treaty itself* converts the reserved sections into *individual property;* the reservation, unless accompanied by words limiting its effect, is equivalent to a present grant of a complete title in fee simple; and that title is alienable by the grantee at his pleasure, unless the United States, by a provision of the treaty, or of an act of Congress, have expressly or impliedly prohibited or restricted its alienation."

In Little Bill v. Swanson, 64 Wash. 650, 117 Pac. 481, it was held that the title of an Indian, under section 5 of the 1887 act, is an inheritable estate—a holding absolutely in conflict with our holding in Carlow v. Jordan, 39 S. D. 28, 162 N. W. 749. We held that the father of a deceased allottee had no interest in the allotted land until he received his patent therefor—that he did not take anything by inheritance from his son. In U. S. v. Park

Land Co. (C. C.) 188 Fed. 383, it was held that the estate of the allottee is an inheritable estate passing, as provided by section 5, Act 1887, to those who, under the laws of the state, where the land is situate, are heirs of the deceased.

In Parr v. U. S. (C. C.) 153 Fed. 462, there is a very full discussion as to the nature of the estate that is held by the allottee, and particularly as regards the inheritable quality of such estate. The court was considering a section of the act of March 3, 1885, identical in its provisions with section 5, Act 1887, and in part said:

"What, then, is made descendable or inheritable? Is it the fee, or is it merely the right of occupancy, or has the government carved out of this Indian title a trust estate for them, whereby the Indians is accorded an equity only for the time being, and is that the estate which the law declares to be inheritable? Counsel for defendants insist that it is this latter equitable estate that is within the intendment of Congress; but with this contention I am unable to agree. As I have shown, Congress was dealing with the fee of those Indian Lands with a purpose of investing that title ultimately in the Indians in severalty for their sole and exclusive ownership and management, as a citizen of the United States might own and manage property for his exclusive benefit. The scheme was by allotment among the Indians of that to which they were entitled by treaty and by the long-continued policy of the general government. Hence the government adopted a procedure for setting aside or distributing to each Indian concerned that to which he was entitled. To accomplish that purpose in manner deemed by Congress to be to the best interests of the Indians, it was considered wise to withhold the ultimate title from them for a while, but the scheme was for the allotment ultimately of that title; and so it was the fee with which Congress was dealing, and it was the fee concerning which the allotments were to be and were made. Such being the case, it is the fee that Congress has made inheritable according to the laws of the state of Oregon. The estate is therefore one of inheritance, and the right of curtesy attaches."

And the court further said:

"Nor am I, after a careful review of the entire subject, now of the opinion, as indicated by the case of Kalyton v. Kalyton, 45 Or. 116, 129, 74 Pac. 491, 78 Pac. 332, that the heirs of Indian

allottees 'take as donees of the United States and not by inheritance.' ''

See, also, Beam v. United States, 162 Fed. 260, 89 C. C. A. 240.

We now come to a consideration of the case of U. S. v. Chase, 245 U. S. 89, 38 Sup. Ct. 24, 62 L. Ed. 168, a misconstruction of which seems to me to have been responsible for much of the error into which this court has fallen. Let us remember that it was held in Jones v. Meehan, supra, that the rights of the individual members of an Indian tribe, where the tribe as such holds land, is a mere right of occupancy. The Omaha Indians, *as a tribe,* had, under the treaty of March 6, 1865, been given certain land; under this treaty, a specified tract of this land had been assigned to Chase; and, under the act of 1882, an allotment of this same tract was made to Wolf. This gave rise to conflicting claims to this contract, and the court had occasion to consider what rights it was that passed to Chase under the *treaty,* and what rights passed to Wolf under the *allotment.* Just as was held in Jones v. Meehan, supra, and in the numerous decisions cited in that case, it was recognized, both by the the government and by the Indians, that under the *treaty* each Indian had a *mere possessory right* and no *individual estate* or *interest* in the particular land which he might occupy; and, as set forth in such decision, this tribe of Indians, fully realizing the fact that under the *treaty* they had no *title* to the land occupied by them, presented a petition to Congress. In this petition they stated that they had taken out certificates of allotment within the limits of the reservation; that they had worked and farmed for years; that many of them had built houses and had endeavored to make permanent homes; and they petitioned:

"We therefore petition your honorable body to grant to each one a *clear and full title* to the land on which he had worked. We earnestly pray that this petition may receive your favorable consideration, for we now labor with discouragement of heart, *knowing that our farms are not our own and that any day we may be forced to leave the land* on which we have worked. We desire to live and work on these farms where we have made homes, that our children may advance in the life we have adopted. To this end and that we may go forward with hope and confi-

dence in a better future for our tribe, *we ask of you titles to our lands.*"

In answer to this petition, the act of 1882 was enacted. The provisions considered in the Chase Case are identical with the provisions of section 5, Act 1887. There can be no question but that the purpose and effect of this act of 1882 was to carry out just what the Indians prayed for, namely, to give to each a full estate in the lands that might thereunder be allotted to him; but, recognizing the mental incapacity of the Indians, Congress enacted that the government should hold the legal title to such estate in trust, and provided that the allottee could not alienate his equitable estate. The court, in discussing the rights of the Indians under the treaty, states that they have a mere right of occupancy thereunder; but there is not a syllable in the decision that holds that, under the *act,* the allottees did not get what they prayed for—titles to their lands; nor is there a word holding that they did not get just what the clear words of the act provided for, to wit, a full fee title held in trust for them for 25 years and without power of alienation. An examination of the decision of this case reported in 222 Fed. 593, 138 C. C. A. 117—which decision was reversed in the decision I have been considering—reveals that the lower court wrongfully held that, under the *treaty,* Chase received an *inheritable fee estate.* The higher court reversed this holding but in effect held that Wolf acquired such an estate under his *allotment.* There were two holdings by the lower court that are fully supported by authority and which are very pertinent to the questions before us:

"No act of Congress or legislative fiat constitutes due process of law, whereby a vested right in or title to property may be either seriously impaired or destroyed."

"An estate in fee simple is where one has an estate in lands or tenements to him and his heirs forever, and such an estate is not inconsistent with a restriction on alienation."

It was expressly held in Libby v. Clark, 118 U. S. 250, 6 Sup. Ct. 1045, 30 L. Ed. 133, that a limitation upon power of alienation is not inconsistent with the granting of a fee simple estate.

[7] It would seem to me, however, that the act of June 25, 1910, makes clear the fact that the allottee gets an estate in the land, which estate is inheritable. I am therefore of the opin-

ion that Paul Gondrow was, by his patent dated November 24, 1894, vested with an inheritable equitable fee estate in and to the lands in question without power of alienation of such estate; that this estate was, at the time of his death, held in trust by the federal government, in which was vested the legal title; that this estate was an inheritable estate, subject to be inherited in accordance with the laws of inheritance of the state where this land was situated; that such estate did immediately, upon the death of Gondrow, vest in his heir or heirs; that neither Congress nor any one acting under any authority granted by Congress could divest such heir or heirs of such estate; that the only effect of the act of May 27, 1902, was to confer upon the heir or heirs of Gondrow the power to alienate such estate; that such alienation was subject to the approval of the Secretary of the Interior; and that a conveyance by the heir or heirs, approved by such Secretary of the Interior, conveyed the legal title to such fee-simple estate.

It is held by some of my colleagues that there is an analogy between an entry under the timber culture or homestead acts and the receipt of an allotment under the 1887 Indian Act, and that the authorities holding that an entryman has no inheritable estate before patent are applicable to the case before us. With this I cannot agree. The entryman acquires nothing but the preference right, entitling him, upon doing those things required by law, to, at some time in the future, acquire title to and ownership of the land in question. There is nothing of an inheritable nature in the right he has acquired, because the government has conveyed nothing. The law, however, provides that, in case of his death, his heirs shall have a right to go on and complete those things left undone by him and then receive from the government, and not by descent, title to the land. In case of an allotment, the allottee gets, by conveyance, a full equitable fee estate in the land, the only restriction being that he cannot convey it for a term of years. The government merely holds the legal title in trust for him; the government retains no estate in the land. The grantee from the government, just as would be the case where the grant is from an individual with like restriction as to alienation, takes all the estate the grantor had and an estate which in its very nature is inheritable.

[8, 9]   While Congress had no authority to divest the

heir or heirs of Gondrow of the estate that vested in him or them upon his death, it did have the power to designate the tribunal that should determine who his heirs were. The judgment of such tribunal, if rendered upon such a notice and hearing as would constitute due process of law, would be binding even though erroneous. Thompson v. Lake Madison Chautauqua Ass'n, 170 N. W. 578. The effect of an erroneous judgment might be to adjudge those to be heirs who in truth and fact were not heirs; but if there were a valid judgment determining that Mazar Gondrow, through whom defendants claim, was the heir of Paul Gondrow, then defendant should prevail.

There can be no doubt but that it is within the power of Congress to constitute the Secretary of the Interior a tribunal with authority to determine the heirs of allottees. Had Congress done this prior to the execution of the deed of Mazar Gondrow; and, if so, was there ever a valid judgment of the tribunal so constituted adjudging Mazar Gondrow to be the heir of Paul Gondrow? Upon the answers to these questions this cause must finally turn.

Defendant's demurrer herein admits the allegations of plaintiff's reply, which are in part:

"That no notice of any kind whatever of any hearing upon petition or contemplated hearing by the Secretary of the Interior, * * * for the purpose of finding and determining the heirs of said deceased allottee, was ever given to this plaintiff by the Secretary of the Interior, * * * and that if the Secretary of the Interior * * * did find or determine, * * * or undertake to find or determine the heirs of said allottee, such officer did so without notice to this plaintiff; * * * that neither the Secretary of the Interior nor any other officer of the Interior Department ever at any time appointed or fixed a time or place for hearing or investigating the question of heirship of the estate of said allottee, and never did in fact conduct any such hearing or receive or consider any evidence relating to the question of who was the heir of said allottee. * * * "

Under the facts so alleged, the Secretary of the Interior, even though there had been an act constituting him a tribunal to determine heirship, never acquired jurisdiction to act in this matter.

Defendant's demurrer should have been overruled and the judgment of the trial court must be reversed.

If it were not for the fact that, upon the further trial of this cause, it may be established that the Secretary of the Interior did give due notice of a hearing, and did take evidence upon the question of who was the lawful heir of Paul Gondrow, we would be justified in not now determining whether Congress ever constituted the Secretary of the Interior a tribunal with authority to adjudge who are the heirs of allottees. But, in view of the fact that such question may come before the trial court and our former opinions might be misleading thereon, we should now determine this matter.

[10] A reading of the act of 1887 discloses that there is nothing therein which, by the most elastic stretch of imagination, could be held to constitute the Secretary of the Interior a tribunal to determine any question of heirship. The allotments are to be made by the President through special agents by him appointed, and under rules and regulations prescribed by the Secretary of the Interior. To prescribe rules under which the President, through his agents, shall make allotments of lands, cannot be held to give the maker of such rules the power, in case of death of allottee, to determine his heirs; and yet, from statements contained in certain of the federal decisions, one might gather the impression that Congress had, by such act given such power to the Secretary of the Interior. Thus in Hallowell v. Commons, 239 U. S. 506, 36 Sup. Ct. 202, 60 L. Ed. 409, a case involving the 1882 act, we find the court, in speaking of the act of June 25, 1910, which clearly makes the Secretary of the Interior a tribunal with authority to determine the heirs of an allottee, saying:

"This act restored to the Secretary the power that had been taken from him by acts of 1894 and February 6, 1901," and citing McKay v. Kalyton, supra.

In Bond v. U. S. (C. C.) 181 Fed. 613, in considering the 1887 act, the court called attention to the fact that, in Hy-yu-tse-mil-kin v. Smith, 194 U. S. 401, 24 Sup. Ct. 676, 48 L. Ed. 1039, and in McKay v. Kalyton, supra, the court had held that—

"The sole authority for settling all controversies necessarily

including the determination of the title * * * of the Indian allotments * * * resided, in the Secretary of the Interior."

Both the Smith and Kalyton Cases were cases where the court had under consideration the act of 1885. All the later decisions are based upon the following statement of the court in the Smith Case:

"By section 6 of the act the Secretary of the Interior had power to determine all disputes between Indians respecting the allotments."

An examination of said section 6, Act 1885, discloses that such section, in direct and specific language, grants such power, but such power is limited to cases arising under such act. No similar provision is to be found in the act of 1887, and there is no case that holds, as an original proposition, that the act of 1887 gave any power to the Secretary of the Interior to determine any question of heirship.

But there is an authority in point—the decision in Richardville v. Thorpe (C. C.) 28 Fed. 52—and this decision has never been reversed or in any manner questioned; neither can there be found in the books any statement inconsistent therewith, if we keep in view the fact that any holdings apparently inconsistent are traceable to section 6 of the act of 1885. In the Thorpe Case, as in the case at bar the allottee had died and the parties on the one side were claiming as his heirs. Upon the other side was an approved deed, executed by parties purporting to be the heirs of the allottee, which deed was accompanied by a certificate of two Indian chiefs, and such deed approved by the Secretary of the Interior. It was the contention in that case, as in this, that the effect of such deed, approved as it was, was to carry the title to this land, regardless of the fact that the grantors therein named were in fact not heirs of the allottee. Referring to the act of Congress involved, the court says that the act provided "for the allotment and patenting of these lands to the Indians in severalty authorized their sale under such regulations and rules as should be prescribed by the Secretary of the Interior," just as the 1887 act provides for allotments to be made by the President's agents, "under such rules and regulations as the Secretary of the Interior may from time to time prescribe." Acting under such act, the Secretary of the Interior had issued rules, one of

which was to the effect that, where the patentee was dead, the deed should be accompanied .by a certificate of the head chiefs that the grantors were the sole heirs of the deceased. The question before the court was whether this deed, approved by the Secretary of the Interior and having such a certificate accompanying it was sufficient to divest the real heirs of their title. The court says:

"Such action of the chiefs and the Secretary of the Interior would obviously not be sufficient, under the federal statute alone, because that gives no authority to the Secretary of the Interior to prescribe rules and regulations by which other persons than those who held the title could divest the real holder of such title. He can say what evidence shall be submitted as to the competency of the grantor, his ability to manage his affairs, the fact that the money was paid, that he acknowledged the deed, and all kindred matters. But beyond that it gives him no power to act. He had no judicial power to adjudge a forfeiture, to decide questions of inheritance, or to divest the owner of his title without his knowledge or consent."

Neither did the act of May 27, 1902, in any manner empower the Secretary of the Interior to adjudge who were heirs. It did two things: It removed the ban against alienation. In place of this ban, it sought to protect the heir against his own weaknesses by requiring that the sale be approved by the Secretary of the Interior. The approval of the Secretary of the Interior makes effective the act of the grantor, provided such grantor is the heir of the allottee; if the grantor is not such heir, the approval of the deed is of no effect whatsoever; in either case the estate that will pass by the grant is such and only such as the grantor possessed. When the Congress saw fit to give the Secretary of the Interior the power to adjudicate as to who were heirs of a deceased allottee, it did so in language absolutely free of all doubt. Act June 25, 1910.

McCOY, P. J. (concurring in result reached by Justice POLLEY.) Although of the view that those who are called the heirs of a deceased allottee do not take title as an inheritance, I am of the opinion that the judgment should be reversed. The heirs mentioned in the federal statute are merely grantees to whom the government will convey title in lieu and in place of the deceased

allottee. If it were not for the provisions of section 5 of the Act of February 8, 1887 (section 4201, U. S. Comp. Stat.), on the death of an allottee, the United States would be under no obligation and could not convey to heirs of a deceased allottee; but by virtue of this statute the United States is authorized to grant the allotted land, that otherwise would have been granted to the original allottee had he not died, to certain persons denominated heirs. The heirs are simply substituted by the statute as grantees in place of the original allottee when he dies. In the absence of a federal inheritance law, I am of the view that the heirs of an allottee take as grantees under a statute. This court in Aspey v. Barry, 13 S. D. 220, 83 N. W. 91, and again in Gould v. Tucker, 20 S. D. 226, 105 N. W. 624, held that an heir under the timber culture law took title as a direct grantee from the government and not by inheritance. To the same effect are the decisions in the following cases: Rogers v. Clemmans, 26 Kan. 522; Cooper v. Wilder, 111 Cal. 191, 43 Pac. 591, 52 Am. St. Rep. 163; Towner v. Rodegeb, 33 Wash. 153, 74 Pac. 50, 99 Am. St. Rep. 936; Gjerstadengen v. Van Duzen, 7 N. D. 612, 76 N. W. 233; 66 Am. St. Rep. 679; Hall v. Russell, 101 U. S. 503, 25 L. ed. 829; Hershberger v. Blewitt (C. C.) 55 Fed. 170. So far as the question of transmission of title to heirs is concerned there is no difference in principle between the provisions of the allotment law and the public land law relating to timber culture, homestead, and pre-emption laws which provide that upon the death of the entryman the government will convey by patent to his heirs. In Hall v. Russell and Hershberger v. Blewitt and exception is made as to grants by the government which take effect in præsenti.

I am of the view that the preliminary trust patent issued to an allottee conveys no title in præsenti. It is stated in the federal decisions that in determining whether a grant by the government takes effect in præsenti or at some future time must be determined by the provisions of the law which authorized the grant, as such law is a conveyance as well as a law. The Allotment Act in substance provides that upon the approval of the allotment a preliminary patent shall issue to the legal effect and declare that the United States will hold the allotted land in trust for 25 years for the sole use and benefit of the allottee, and in case of his death, for his heirs, and at the expiration of the 25

years it will convey the same in fee, discharged of the trust, to the allottee or his heirs. There is not a word in relation to the granting of title mentioned in the preliminary patent. The preliminary patent does not purport, either expressly or impliedly, to convey or grant anything at all to the allottee, but merely declares that the government will hold the allotted land in trust for the allottee's use and benefit for 25 years, at the expiration of which time the government will convey the fee title, absolute and complete title, to him. In other words, the government in effect has reserved and held to itself absolute and complete fee title for the period of 25 years, giving to the allottee in the meantime only the right to use or receive the benefit from such allotted land. The allottee was required to wait 25 years, as a condition precedent, before he became a qualified recipient of the grant of any kind of title. It was just as necessary for the allottee to wait 25 years to qualify himself to take title as it was for the tree claim entryman to plant and cultivate trees for 10 years. Under the decisions cited I am of the view that the allottee in question had no inheritable title at the time of his death. A preliminary trust patent does not convey to the allottee any title.

[11] Whether those who succeed to the rights of a deceased allottee take as heirs of an inheritance or as designated grantees under a statute is not decisive of the vital question involved on this appeal. The appellant in either case has a right to maintain this action. The statute gives her as much or more rights than she would have under an inheritance. She would be substituted under the statute to all the rights possessed by the deceased allottee, had he been alive. Here in this case it appears that appellant was the only heir of the deceased allottee, and, without negligence, fault, or even knowledge on her part, another person, not an Indian, in no way related to deceased, and not an heir, wrongfully, fraudulently, and without right, made a deed of conveyance of the allotment and secured the approval of the Secretary of the Interior thereto, presumably pretending to act as an adult heir under the provisions of the Act of May 27, 1902. I am of the opinion that such deed was absolutely void. It was secured by extrinsic fraud, and was a fraudulent imposition on appellant and on the Secretary of the Interior, and this whether or not the Secretary possessed power or quasi judicial authority, to deter-

mine the question of heirship. If the Secretary had been clothed with full judicial authority to determine such questions of heirship, such extrinsic fraud, nevertheless, would have vitiated his act of approval. Paul v. Paul, 170 N. W. 658; Sohler v. Sohler, 135. Cal. 323, 67 Pac. 282, 87 Am. St. Rep. 98. This counterfeit and pretended heir, who so made and received said deed, acquired no title thereby and was powerless to transmit title to any one whomsoever. The grantee under this void deed was as powerless to transmit title as would be the thief of stolen property. Said deed had no more force or effect than a forged deed, and, in principle, was legally analogous to a forged deed. The recording statutes furnish no protection to those who claim as innocent purchasers under a forged or otherwise void deed, where the true owner has been guilty of no negligence or acts sufficient to create an estoppel. Devlin on Deeds (3d Ed.) § 726; 8 R. C. L. 1029; Vesey v. Solberg, 27 S. D. 618, 132 N. W. 254; Pry v. Pry, 109 Ill. 466. The equity rule that fraud vitiates everything it touches applies to the circumstances of this case.

[12-15] It is contended that if the facts sustain extrinsic fraud, and that appellant still holds this land as an allottee, this action must be dismissed because of the decision in McKay v. Kalyton, 204 U. S. 456, 458, 27 Sup. Ct. 346, 51 L. Ed. 566, holding that under the Act of Congress of August 15, 1894, c. 290, 28 Stat. 286, the United States Circuit Courts were given exclusive jurisdiction over such actions. In McKay v. Kalyton and in Hy-yu v. Smith, 194 U. S. 408, 24 Sup. Ct. 676, 48 L. Ed. 1039, it was held that prior to said act of 1894 the authority to determine such conflicting rights to Indian allotments was in the Secretary of the Interior, but by the said act of 1894 such authority was placed exclusively in the federal circuit courts. By the same reasoning I am of the view that by the Act of June 25, 1910, such jurisdiction and authority was again placed in the hands of the Secretary of Interior, and taken out of the hands of the federal Circuit Courts. While such authority was in the Secretary of Interior, prior to 1894, it was generally held, under the provisions of section 6 of the Act of February 8, 1887 (U. S. Comp. St. § 4203), the Dawes Act, that state courts had jurisdiction of such controversies. Felix v. Patrick, 145 U. S. 317, 12 Sup. Ct. 862, 36 L. ed. 719; In re Heff, 197 U. S. 488,

25 Sup. Ct. 506, 49 L. ed. 848; Wa La v. Carter, 6 Idaho, 85 53 Pac. 106; Bird v. Winger, 24 Wash. 269, 64 Pac. 178. Now that such authority has again been replaced in the Secretary, it would seem reasonable that· the prior rule as to the jurisdiction of state courts should also again be in force, as under the authority of the McKay Case state courts were deprived of jurisdiction only because the Act of August 15, 1894, placed the exclusive jurisdiction of such controversies in the circuit courts. The Act of June 25, 1910, completely took away such jurisdiction and placed it in the Secretary of the Interior, where it was prior to 1894.

It seems to be conceded by Justice Gates that the Act of June 25, 1910, took the jurisdiction to determine conflicting heirship to allotments entirely out of the federal courts, where it had been placed by the said act of 1894, and again reinvested the Secretary of State with such jurisdiction. The reason for the rule established by the Kalyton Case then ceased to exist, and we are again back to where we were before the act of 1894. · The precise question involved is this: Has an Indian a right to maintain a suit as a plaintiff in the state courts to obtain remedial redress under the circumstances of this case? It is conceded that an imposter who was not an heir, by fraudulently claiming to be an adult heir, succeeded in having the Secretary of the Interior approve a deed made by him, the said imposter, to a third party without the knowledge or consent of Mary Highrock, the true heir. She is seeking redress in the state court against a conceded wrongdoer. It is purely and only a remedy that she is seeking in the courts of this state. Her substantive right under the federal law is admitted. It is true that her substantive right, which she claims has been invaded, and which is the basis of her right to remedy, is based solely on federal laws. That is the situation of any one relying on a patent from the government as the source of his title. As the heir of the deceased allottee she has an equitable interest in the land in question sufficient to authorize her to maintain this suit. Section 2846, Code 1919; Bird v. Winyer, 24 Wash. 269, 64 Pac. 178. All the judgement, all the relief, she can obtain in this action, is a decree against the wrongdoer that she, as the admitted heir of the deceased allottee, is entitled to the possession, use, and benefits of said land. She may at some future time apply to the

Secretary of the Interior for a fee title final patent, and a decision of the state court in this case would in no way interfere with such application. She is within the rule that, unless there is some law prohibiting it, an Indian may maintain in the state courts an action for a wrong against the person or property of such Indian. Bam-Way, etc., v. Eshelby, 87 Minn. 108, 91 N. W. 291; Blackbody v. Maupin, 38 S. D. 621.

With it conceded that the Act of August 15, 1894, on which the Kalyton decision was based, has been inherently repealed by the Act of June 25, 1910, there is no law prohibiting the maintenance of such a suit by an Indian. This view is fully sustained by the decision in Felix v. Patrick, 145 U. S. 317, 12 Sup. Ct. 862, 36 L. ed. 719. In that case, decided in 1891, an Indian was plaintiff, seeking to set aside title to land alleged to have been acquired by fraud, and the defendant alleged laches and delay on the part of the Indian plaintiff as a defense, and the Indian plaintiff replied that there was no court in which he could seek redress prior to the Act of February 8, 1887, the Dawes Act, permitting suits by Indians in the federal courts, and in rendering the decision the Supreme Court of the United States said:

"It is scarcely necessary to say in this connection that, while until this time [the passage of the Dawes Act] they were not citizens of the United States, capable of suing as such in the federal courts, the courts of Nebraska were open to them, as they are to all persons, irrespective of race or color."

This case cites with approval the decision of the state court of Kansas in Wiley v. Keokuk, 6 Kan. 94, which said that the Indian has a right to appeal to the laws of the state for redress. "It is not in the power of any tribunal to say: 'You are an Indian, and your rights rest in the arbitrary decrees of executive officers, and not in the law.'" The decision in the Felix Case has never been overruled. It may not have been applicable while the Act of Congress of August 15, 1894, was in force.

The Nice Case, cited by Justice GATES, is not applicable to a case of this character. That was a criminal prosecution against an Indian defendant charged with the sale of intoxicating liquors. Whatever was said by the court in that case in relation to land titles of heirs of allottees was obliter. The court in that case did not purport, either expressly or impliedly, to pass upon and decide

the question as to whether or not an Indian allottee under the circumstances of this case may not maintain an action in the state courts. The state courts possess original, plenary, equity power or jurisdiction of suits by Indian plaintiffs in cases where their conceded rights under their Indian titles are interfered with. It may be true that if the Secretary of the Interior, under the provisions of the Act of June 25, 1910, had tried out and determined the merits of the heirship of Mary Highrock, such determination would be binding upon this court. But that is not this case. In this case it is conceded for the purposes of this suit that appellant is the only rightful heir of the deceased allottee.

[16]   Again section 20, article 6, state Constitution, provides that all courts of this state shall be open to every man for injury to his person or property, for which he shall have a remedy by due course of law without denial. This brings the appellant squarely within the rule of the Felix Case. Also see 22 Cyc. 116. But Justice GATES contends that section 4 of our Enabling Act shuts the appellant out of maintaining this suit. I am of the view that the "Indian title" mentioned in this section of the Enabling Act has not the remotest relation to the "Indian title" involved in this suit. The "Indian title" mentioned in the Enabling Act was the aboriginal Indian title of the Great Sioux Nation, a portion of which was then in process of being extinguished in favor of the United States, to the end that the same might become a part of the public domain, from which Indian allotments might thereafter be made. When the government grants an allotment to an Indian allottee, it does not extinguish any Indian title, but creates a new one, in partial consideration of the extinguishment of the aboriginal title, which theretofore had been extinguished by the United States. The "Indian title" mentioned in the Enabling Act had to be extinguished before an allotment could be made.

It is a well-known matter of history that, when some of the earlier states were admitted into the Union, with Indian reservations within their borders, the aboriginal Indian title was not extinguished and the Indians claimed the right to dispose of such aboriginal title direct to the state. 22 Cyc. 123. But when South Dakota came into the Union the United States government required that she disclaim all right and title to aboriginal Indian lands. Our Enabling Act was passed

February 22, 1889. 25 U. S. Stat. at Large, p. 676, c. 180. At that time the United States government was in process of extinguishing the aboriginal title to a part of the lands within the Great Sioux Nation. The method of extinguishing aboriginal title by the United States is either by treaties with the Indians or statutes in aid or having the nature of treaties. On April 30, 1888 (25 U. S. Stat. at Large, pp. 95, 206), an act was passed for the purpose of extinguishing aboriginal titles in South Dakota, but which act contained a provision that, unless the Indians within one year in writing accepted the provisions thereof, the act itself would be void. That act was never accepted, but on the 2d day of March, 1889, 10 days after our Enabling Act another similar act for similar purposes was enacted (25 U. S. Stat. at Large, p. 888, c. 405), which act was thereafter accepted by the Indians, and which act, by section 21 thereof, extinguished aboriginal titles, and restored to the public domain all those portions of the Great Sioux Nation, excepting Farm Island and other tracts of land specifically described.

In view of this situation, I am of the opinion that the Indian title mentioned in Section 4, of the Enabling Act applied *and only could apply,* to the extinguishment of the aboriginal titles then being extinguished by the United States government. The Enabling Act says that until the said Indian titles shall have been extinguished said Indian lands shall remain under the absolute jurisdiction and control of the United States. The land involved in this suit was land to which the aboriginal title had been extinguished prior to the allotment in question. Those particular portions of the Great Sioux Nation which are particularly described in the Act of March 2, 1889, as not having been restored to the public domain, are all and the only lands that remain under the absolute jurisdiction of the United States within the meaning of section 4 of our Enabling Act. Congress, in passing section 4 of the Enabling Act, only had in contemplation the extinguishment of aboriginal Indian titles.

The judgment should be reversed.

SMITH, J., concurs with the views expressd by McCOY, P. J.

GATES, J. (dissenting). I greatly regret that the other four members of this court were apparently hypnotized into

concurrence with the opinion in Daugherty v. McFarland, 40 S. D. 1, 166 N. W. 143. Every point that is now advanced in the separate opinions of Judges POLLEY and WHITING was advanced in the briefs in that case or in one or more of the following cases, viz.: Egan v. McDonald, 36 S. D. 92, 153 N. W. 915; Tripp v. Sieler, 38 S. D. 321, 161 N. W. 337; Oldham v. Nelson, 38 S. D. 451, 161 N. W. 814; Carlow v. Jordan, 39 S. D. 28, 162 N. W. 749. Every federal statute and every federal case cited by them, unless it be Richardville v. Thorp (C. C.) 28 Fed. 52, was cited in the briefs in one or more of these cases. Every one of such points and all of such authorities were carefully and painstakingly considered by me, at least, in the preparation of the opinion in Daugherty v. McFarland.

Two principal questions are presented by this appeal. The first is whether the Congress had power to invest the Secretary of the Interior with authority to divest the governmental legal title and the equitable title or equitable interest of tribal Indians in lands allotted by government trust patents to the ancestor of such tribal Indians, pursuant to the General Allotment Act of February 8, 1887, c. 119, 24 Stat. 388, and the Special Allotment Act of March 2, 1889, 25 Stat. 888, c. 405. The second question is whether the Congress did so by the provisions of section 7 of the Act of May 27, 1902, 32 Stat. 275, c. 888 (U. S. Comp. St. § 4223.) Both questions are in effect answered in the negative by the opinion of Judge POLLEY and the concurring opinion of Judge WHITING. Judges McCOY and SMITH do not pass upon these questions. I think both questions should be answered in the affirmative.

Judge POLLEY would affirm the conclusion in Daugherty v. McFarland, 40 S. D. 1, 166 N. W. 143, but would disapprove of much of the reasoning thereof, on the ground that he claims many statements in the opinion to be obiter. As the principal ground for so contending he says that the partition suit in the circuit court settled the rights of the heirs of Goodcloud and Iron Soldier, but some of the land involved in such partition suit was still held under trust patent. There is no pretense but that some of the land involved in that suit was still wholly under federal control. As to such land the state court clearly had no jurisdiction. McKay v. Kalyton, 204 U. S. 458, 27 Sup. Ct. 346, 51 L. ed. 566.

How, then, could it apportion something over which it had no authority? The basis of a partition suit is mutuality of interest and jurisdiction in the court to dispose of the mutual interests. So it seems clear to me that Judge POLLEY errs in his view that the statements quoted by him from Daugherty v. McFarland were obiter. The gist of Judge POLLEY'S opinion is that, while federal control over, and the legal title to, the land in question passed from the federal government by the approval of the deed, yet, the approval being erroneous and fraudulent, the grantee took, and his successor now holds, the legal title in trust for the owner of the equitable estate. Under his view no question arises as to the correctness of the decisions above referred to, except in so far as he considers portions of Daugherty v. McFarland to be obiter.

Judge WHITING claims that the decision in Daugherty v. McFarland was wrong, and he would overrule it, and also the decision in Carlow v. Jordan, 39 S. D. 28, 162 N. W. 749. In fact it seems clear to me that the effect of his opinion would be to not only overrule these decisions, but also the decisions in Egan v. McDonald, 36 S. D. 92, 153 N. W. 915, Tripp v. Sieler, 38 S. D. 321, 161 N. W. 337, Id., 39 S. D. 221, 164 N. W. 67, and Oldham v. Nelson, 38 S. D. 451, 161 N. W. 814, as will hereinafter appear. To fortify his position Judge WHITING lays down some categorical assertions as to what any lawyer would believe to be the law. . I would add other paragraphs to those enumerated by him as to what a lawyer would conclude, etc., viz.:

"Any lawyer called upon to construe the Omaha treaty of March 6, 1865, would, if free from any impression as to how the courts had construed it, reach the conclusion that the act provided for vesting title in the allottees and therefore that the Circuit Court of Appeals had reached a correct determination in Chase v. U. S., 222 Fed. 593."

But the Supreme Court of the United States reversed such decision in U. S. v. Chase, 245 U. S. 89, 38 Sup. Ct. 24, 62 L. Ed. 168.

Again:

"Any lawyer, called upon to construe section 17, c. 405, Act of March 2, 1889, would say that the Indians were the

owners of the allotted personal property, subject only to the restriction as to disposal to others than Indians."

But the Supreme Court of the United States has many times held that such property was "government property." U. S. v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. ed. 532; U. S. v. Pearson, 231 Fed. 270. The point I seek to make is that we cannot view these federal statutes simply from the standpoint of the language contained in them. They must be viewed from the standpoint of the general relation between the Congress and Indian tribes, as disclosed, not only by those and a multitude of other acts, but also by the decisions of the Supreme Court and other federal courts construing them, and also by the attitude of the federal executive department towards tribal Indians. Lane v. Pueblo of Santa Rosa, 249 U. S. 110, 39 Sup. Ct. 185, 63 L. ed. 504.

In Daugherty v. McFarland, we said:

"From the various acts of Congress, and from the interpretations thereof by the many decisions of the Supreme Court of the United States, we are of the opinion that the lands alloted under the Act of February 8, 1887, continued to be government property; that the government by its Congress had complete authority over tribal Indians and over the property, real or personal, committed to them, unaccountable to any other body or tribunal; that, while it held the property in trust for the Indians, such trust differed from the ordinary trust, in that Congress had full authority to make or unmake the rules governing the execution of the trust; that the federal government could dispose of such property through the agency of the Secretary of the Interior."

Were we justified in making that statement? In Stephens v. Cherokee Nation, 174 U. S. 445, 483, 19 Sup. Ct. 722, 736 43 L. ed. 1041, a case involving the rights of Indians, the court quoted with approval:

"It is well settled that an act of Congress may supersede a prior treaty, and that any questions that may arise are beyond the sphere of judicial cognizance, and must be met by the political department of the government"—citing Thomas v. Gay, 169 U. S. 264, 271, 18 Sup. Ct. 340, 42 L. ed. 740.

In U. S. v. Pelican, 232 U. S. 442, 447, 34 Sup. Ct. 396, 399 58 L. ed. 676, the court said:

"That the lands, being so held, continued to be under the jurisdiction and control of Congress for all governmental purposes, relating to the guardianship and protection of the Indians, is not open to controversy."

In Williams v. Johnson, 239 U. S. 414, 36 Sup. Ct. 150, 60 L. ed. 358, the court said:

"It has often been decided that the Indians are wards of the nation and that Congress has plenary control over tribal relations and property and that this power continues after the Indians are made citizens, and may be exercised as to restrictions upon alienation."

In Brader v. James, 246 U. S. 88, 38 Sup. Ct. 285, 62 L. ed. 591, the court distinguished cases concerning the rights of Indians who "had been given full ownership with all the rights which inhere in ownership in persons of full legal capacity" from the rights of tribal Indians, saying:

"Those decisions do not place limitations upon the right of Congress to deal with a Tribal Indian whose relation of ward to the government still continues, and concerning whom Congress has not evidenced its intention to release its authority."

In Nadeau v. Union Pac. R. Co., 253 U. S. 442, 40 Sup. Ct. 570, 64 L. ed. 1002, an opinion handed down June 7, 1920, the court said (the italics are ours):

"It seems plain that, *at least until* actually allotted in severalty [1864,] the lands were but part of the domain held by the tribe under the ordinary Indian claim—the right of possession and occupancy—with fee in the United States. Beecher v. Wetherby, 95 U. S. 517, 525, 24 L. ed. 440. The power of Congress, as guardian for the Indians, to legislate in respect of such lands is settled. Cherokee Nation v. Southern Kansas Railway Co., 135 U. S. 641, 653, 10 Sup. Ct. 965, 34 L. ed. 295; United States v. Rowell et al., 243 U. S. 464, 468, 37 Sup. Ct. 425, 61 L. ed. 848; United States v. Chase, 245 U. S. 89, 38 Sup. Ct. 24, 62 L. ed. 168."

In U. S. v. Rowell, 243 U. S. 464, 37 Sup. Ct. 425, 61 L. ed. 848, the court said:

"Congress was here concerned with the affairs of Indians

whose tribal relation had not been dissolved—Indians who were still wards of the United States and entitled to look to it for protection. The plan of giving them individual allotments in the reservation theretofore established as a tribal home and of converting the surplus lands into interest-bearing funds was not theirs. But it was obligatory on them, because it was adopted by Congress in the exercise of its control over them. As in other instances, the wish of the ward had to yield to the will of the guardian. And Congress was free to exert this guardianship in any manner which it deemed appropriate, and to adjust its action to new or changing conditions, so long as no fundamental right was violated."

It is the view of Judges POLLEY and WHITING that an estate in land was vested in the allottee by the so-called trust patent, and therefore (in the language of U. S. v. Rowell, supra) that "a fundamental right was violated" by the Secretary of the Interior, if our statement of the law in Daugherty v. McFarland is correct. In the first place, the so-called "trust patent" was not a patent at all, but was a mere declaration of trust. U. S. v. Rickert, 188 U. S. 432, 436, 23 Sup. Ct. 478, 47 L. ed. 532. It was merely an "allotment certificate." Monson v. Simonson, 231 U. S. 341, 345, 34 Sup. Ct. 71, 58 L. ed. 260.

Judge WHITING contends that the allottee was vested with "an inheritable equitable fee estate," and that "neither Congress nor any one acting under any authority granted by Congress could divest such heir or heirs of such estate." Yet it is provided in the Act of June 25, 1910, c. 431, § 1 (section 4226, U. S. Comp. St.), that in case the Secretary of the Interior finds that one or more of the heirs of an allottee are incompetent he may sell the whole land, viz. the interest of the incompetent heir and the interest of the competent heir, and "upon payment of the purchase price in full the Secretary of the Interior shall cause to be issued to the purchaser a patent in fee of such land." There is no provision for a deed by the heirs. The title passes by the patent. Such a provision is scarcely consistent with Judge WHITING'S denial of power in Congress, but we have discovered no decision of the Supreme Court denying such congressional authority. Why, then, did not Congress have power to author-

ize the title to pass by mere approval of a deed under the provision of the Act of May 27, 1902?

Judges POLLEY and WHITING analyze the decision in U. S. v. Chase, 245 U. S. 89, 38 Sup. Ct. 24, 62 L. ed. 168, upon which we in part relied in Daugherty v. McFarland. They seek to show that a different interest in land was vested in the allottee under the Omaha treaty than was allotted under the General Allotment Act. For convenience of comparison we submit the pertinent paragraphs of each, the language in the latter being precisely the same as in the Sioux Allotment Act of March 2, 1889:

Omaha Treaty

"Said division and assignment of lands to the Omahas in severalty shall be made under the direction of the Secretary of the Interior, and when approved by him, shall be final and conclusive. Certifi c a t e s shall be issued by the Commissioner of Indian Affairs for the tracts so assigned, specifying the names of the individuals to whom they have been assigned respectively, and that they are for the exclusive use and benefit of themselves, their heirs, and descendants; and said tracts shall not be alienated in fee, leased, or otherwise disposed of except to the United States or to other members of the tribe, under such rules and regulations as may be prescribed by the Secretary of the Interior, and they shall be exempt from taxation, levy, sale, or forfeiture, until otherwise provided for by Congress." 14 Stat. 668, art. 4.

General Allotment Act.

"That upon the approval of the allotments provided for in this act by the Secretary of the Interior, he shall cause patents to issue therefor in the name of the allottees which patents shall be of the legal effect, and declare that the United States does and will hold the lands thus allotted for the period of twenty-five years, in trust for the sole use and benefit of the Indian to whom such allotment shall have been made, or, in case of his decease, of his heirs according to the laws of the state or territory where such land is located, and that at the expiration of said period the United States will convey the same by patent to said Indian, or his heirs, as aforesaid, in fee, discharged of said trust and free of all charge or incumbrance whatsoever." 25 Stat. 891, c. 405, § 11.

Of the Omaha treaty provision Mr. Justice Van Devanter said that the allotment amounted only to "an apportionment of the tribal possessory right." U. S. v. Chase, supra. Of the General Allotment Act Mr. Justice Harlan said:

"If, as is undoubtedly the case, these lands are held by the United States in execution of its plans relating to the Indians— without any right in the Indians to make contracts in reference to them or to do more than to occupy and cultivate them—until a regular patent conveying the fee was issued to the several allottees, it would follow. * * * " U. S. v. Rickert, supra.

See, also, Bond v. U. S. (C. C.) 181 Fed. 613, an opinion cited with approval in Hallowell v. Commons, 239 U. S. 506, 36 Sup. Ct. 202, 60 L. ed. 409.

It therefore seems. to me that, so far as the interest of the allottee in the land is concerned each of such allotments was of the same force and effect. I have been unable to find anything in any decision of the Supreme Court which repudiates the above statement of Mr. Justice Harlan, except the obiter statement in McKay v. Kalyton, 204 U. S. 458, 27 Sup. Ct. 346, 51 L. ed. 566, adverted to in Daugherty v. McFarland and in the opinions of Judges POLLEY and WHITING herein. However, in Egan v. McDonald, 246 U. S. 227, 38 Sup. Ct. 223, 62 L. ed. 680, the court said of McKay v. Kalyton:

"It decides merely that the Act of August, 15, 1894, c. 290, 28 Stat. 286, which gave to Indians, who claimed to be entitled to an allotment, the right to litigate their claim in a federal court, did not confer the right to litigate in state courts."

An apparent contradiction to the principle we declared in Daugherty v. McFarland, and which I am now contending for, may be found in Choate v. Trapp, 224 U. S. 665, 32 Sup. Ct. 565, 56 L. ed. 941, where it was held that the Congress could not repeal the exemption from taxation during the contracted period, viz. "while the title remains in the allottee;" but that case related to lands the whole title to which, both legal and equitable, had been vested in the allottee subject only to the restriction against alienation. Judge WHITING urges that Jones v. Meehan, 175 U. S. 1, 20 Sup. Ct. 1, 44 L. ed. 49, sustains his position, but there the interest of the Indian in the land was the same as in Choate v. Trapp. It therefore seems clear to me

that while, as against everybody but the federal government, the interest of the allottee under the so-called trust patent had the attributes of an equitable estate, yet as between the federal government and the allottee it was only an equitable interest; in fact, a mere right of possession, because the Congress in its wise discretion might lawfully deprive the Indian of that interest if it thought the best interests of the Indian or the tribe demanded it. 6 U. S. Ency. 920; Lone Wolf v. Hitchcock, 187 U. S. 553, 564, 23 Sup. Ct. 216, 47 L. ed. 299. I therefore conclude that the Congress had the power to authorize the Secretary of the Interior to divest the governmental legal title and the equitable interest of the allottee here in question.

The next question is: Did the Congress so authorize the Secretary of the Interior by the Act of May 27, 1902, c. 888, § 7 (U. S. Comp. St. § 4223). That section authorized a sale by the heirs of a deceased allottee and provided:

"But all such conveyances shall be subject to the approval of the Secretary of the Interior, and when so approved shall convey a full title to the purchaser, the same as if a final patent without restriction upon the alienation had been issued to the allottee."

If a final patent without restriction had been issued to the allottee, there can be no doubt but that the whole title, legal and equitable, to the whole tract would have vested in the patentee. When the act of Congress makes a conveyance, when approved by the Secretary, of like effect as a final patent, the act of Congress evinces to my mind an intent to vest in the Secretary the power, by the approval, to divest the governmental legal title and the Indian equitable title or interest, and to invest the whole in the grantee of the approved deed. It is a necessarily implied power.

Judge WHITING holds that where, as in this case under the admitted facts, the grantor was not an heir of the allottee the approval of the deed by the Secretary of the Interior was of no effect whatever. In another part of the opinion he holds that a deed so approved would "(a) convey such estate and only such estate as the grantor was possessed of, and (b) pass the legal title to such estate." In other words, he would hold that if there are in fact three heirs of the deceased allottee, and

one of them, purporting to be the sole heir, conveys the proper-
ty, and the deed is approved by the Secretary, the only equit-
able estate which passed was one-third of the whole equitable
estate, and the only legal estate that passed was one-third of the
legal estate. But in such case what would be the extent of fed-
eral control? Would the conveyed one-third interest cease to be
under federal control, and would the unconveyed two-thirds inter-
est still remain under federal control? The government would
have received the money for the sale of the whole land, presump-
tively its full value. Was it the purpose and intent of Congress
that in such case there should be a tenancy in common between
the United States and the grantee? Was it the intent of Con-
gress that the government should take the whole proceeds of
sale and still have control of the whole land (under the admit-
ted facts of the present case), or still have control of the undi-
vided two-thirds of the land in the case of the above illustration?
How about the taxes upon this land that have been levied since
1905? Have they been levied unlawfully?

Judge WHITING'S present position directly challenges the
decision of this court in Egan v. McDonald, and indirectly the
decisions in Tripp v. Sieler and Oldham v. Nelson, because all
those decisions assume, and the first one declares, that the whole
legal title that was in the government passed to the grantee by
the approval. If the whole legal title did not pass by the approv-
al, then each of those three decisions is wrong, and in Egan v.
McDonald the state court, in the action to quiet title begun after the
approval, had no jurisdiction over such portion of the land, if
any, as was not conveyed by the approved deed, and no jurisdic-
tion over omitted heirs, if any there were. It seems to me that
it is entirely logical to say that, if the approval by the Secretary
of the Interior removed the land from federal control, then the
necessary effect of the approval was to pass full title. Converse-
ly, if full title was not passed by the approval, then federal con-
trol would not cease. If such final patent had been issued to the
allottee, governmental control of the land would have vanished,
and the patent would have been impervious to collateral attack.
King v. Andrews, 50 C. A. 29, 111 Fed. 860. The deed of
the alleged heir and its approval by the Secretary being of like
force and effect as such final patent, it must follow that govern-

mental control of the land ceased, and the deed and its approval
are not open to collateral attack. The remedy of the present
claimant is to the fund.

Judges POLLEY and WHITING rely on the decision of
Judge Brewer in Richardville v Thorp, 28 Fed. 52, as denying
the asserted authority of the Secretary of the Interior. The fed-
eral act referred to in that opinion is not cited, but it must have
been an act passed prior to 1857, because the patentee died in that
year. It does, however, clearly appear that the fee-simple title
had vested in the patentee Pa-pee-ze-sa-wah. That decision is
not persuasive as to the power of the Secretary of the Interior
under the Act of May 27, 1902.

Again, it seems to me that by approving our decision in
Egan v. McDonald the Supreme Court of the United States in
Egan v. McDonald, 246 U. S. 227, 38 Sup. Ct. 223, 62 L. ed.
680, must be held to have approved the view of this court that
by the approval of the deed federal control of the land ceased,
even though in their opinion they say that we held that—
"the burden was upon the plaintiff to establish the fact, if it was
such, that there were other heirs, and that the mere suggestion
in argument that there may have been some additional heirs does
not cast such a suspicion upon the title as to render it unmerch-
antable."

Nothing of that kind can be found in our opinion in that
case. That was the holding in Tripp v. Sieler. In Egan v. Mc-
Donald we held that the state court had jurisdiction of the action
to quiet title, because the approval of the deed terminated fer-
eral control, and by reason of the judgment in such action the
title was marketable. I therefore am of the opinion that the
Congress did by the Act of May 27, 1902, authorize the Secre-
tary of the Interior to divest the governmental legal title and
the equitable interest of Paul Gondrow in the land in question.

Judges McCOY and SMITH think that, because the approval
was accomplished by extrinsic fraud, the approval was a nullity.
They base their concurrence in reversal upon a ground not pre-
sented to the trial court, nor presented nor argued in the briefs.
The effect of their holding is to reverse the decision in Daugher-
ty v. McFarland in so far only as fraud appears in the securing
of the approval, but the ultimate effect of their view is to unite

them with the position of Judge WHITING; that is, that the approval in this case was a nullity. That being the case, the majority of this court now hold that upon the facts as they now appear in this case there has never been any removal of federal control of this land, and the rights of the plaintiff are as they were before the deed was approved by the Secretary of the Interior. The land is still held in trust by the federal government. Under such a state of facts and under that view of the law, the trial court was without jurisdiction to entertain this action, and this cause should be remanded, with directions to dismiss the action, if the facts sustaining extrinsic fraud appear upon the trial. That must be the result, because by the decision in McKay v. Kalyton, 204 U. S. 456, 27 Sup. Ct. 346, 51 L. ed. 566, a state court has no jurisdiction of controversies involving a determination of title, and incidentally the right of possession of Indian allotments, where the same are held in trust by the United States.

It may be, as suggested by Judge McCOY, that since the Act of June 25, 1910, c. 431, § 1, the federal Circuit (now District) Court would have no jurisdiction of this action. If so, under the theory of Judges McCOY, SMITH, and WHITING, that the approval was a nullity, the remedy of plaintiff will lie only before the Secretary of the Interior, unless some act of Congress can be found giving to state courts such jurisdiction. I am unable to find such act. Section 6 of the General Allotment Act, did, according to Mr. Justice Brewer's interpretation of it in Re Heff, 197 U. S. 488, 25 Sup. Ct. 506, 49 L. ed. 848, give the state courts such jurisdiction; but that decision was squarely overruled in U. S. v. Nice, 241 U. S. 591, 36 Sup. Ct. 696, 60 L. ed. 1192. Moreover, in section 4 of the Enabling Act it was required that the Constitution of South Dakota should contain the following provision, which should be irrevocable without the consent of the United States and the people of South Dakota:

"That the people inhabiting said proposed states do agree and declare that they forever disclaim all right and title * * * to all lands * * * owned or held by any Indian or Indian tribes, and that until the title thereto shall have been extinguished by the United States * * * said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States."

The Constitution of South Dakota did make the above declaration in article 22 and in article 26, § 18. Therefore under the decisions in McKay v. Kalyton and U. S. v. Nice, and the above constitutional provision, the state courts do not have jurisdiction of actions involving a determination of title and the right of possession of Indian allotments, when the same are held in trust by the federal government.

In my opinion Judge McCOY has given the clause "until the title thereto shall have been extinguished by the United States" entirely to narrow a meaning. In my opinion the title there referred to embraces as well the title by which the United States holds allotted lands during the trust period. U. S. v. Ewing (D. C.) 47 Fed. 809; U. S. v. Rickert, 188 U. S. 432, 23 Sup. Ct. 478, 47 L. ed. 532; Williams v. Johnson, 239 U. S. 414, 36 Sup. Ct. 150, 60 L. ed. 358. The clause in said section of the Enabling Act, "held by an Indian or Indian tribes," alone prevents the interpretation given by Judge McCOY. The citizenship of Indian allottees conferred by the act of Congress did not operate to withdraw them nor their property from the control and protection of the federal government. U. S. v. Pearson (D. C.) 231 Fed. 270. Nor do I discover in Felix v. Patrick, 145 U. S. 317, 12 Sup. Ct. 862, 36 L. ed. 719, any support for Judge McCOY'S position. The bill in that case, filed by the heirs of a Sioux Indian, to whom land scrip had been issued in 1857, sought to have defendants declared trustees of lands entered pursuant to such scrip. The court said of the Indian plaintiffs, in support of its holding of laches:

"It is scarcely necessary to say in this connection that, while until this time they were not citizens of the United States, capable of suing as such in the federal courts, the courts of Nebraska were open to them, as they are to all persons, irrespective of race or color."

Of course the courts of South Dakota as well as Nebraska, are open to all persons, irrespective of race or color; but such courts are not necessarily open to all causes of action by all persons. When the Congress, in it capacity as guardian of a race in a state of pupilage and dependency, retained jurisdiction in itself over the lands of Indian and Indian tribes during a specified period, and when the state of South Dakota by solemn

compact assented thereto, it is, in my opinion, presumptuous to say that the courts of this state have jurisdiction of controversies concerning such lands during such period.

It is urged by appellant that equity demands the recognition of title in the present plaintiff, Mary Highrock. The land was sold for its full value, and if the funds were given to one not entitled to them, the Congress, in its capacity of guardian, is morally obligated to cause her to be reimbursed, and we must presume that the Congress will do so, if they find that she is the real heir.  It seems to me that the equities are all with the defendant.

Upon a thorough review of the statutes and authorities bearing upon this case, and the briefs of counsel herein, I still adhere to the opinion in Daugherty v. McFarland.  Nothing that is urged to the contrary has shaken my view as to its correctness. I therefore think that the judgment and order appealed from should be affirmed.