# UNITED STATES OF AMERICA, AS TRUSTEE AND GUARDIAN OF THE OMAHA TRIBE OF INDIANS, ET AL., *v.* CHASE.

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 146.  Argued October 2, 1917.—Decided November 5, 1917.

The assignment of land provided for by Article IV of the treaty of March 6, 1865, 14 Stat. 667, with the Omaha Indians, was merely an apportionment of the tribal right of occupancy to the members of the tribe in severalty, leaving the fee in the United States and

leaving the United States and the tribe free to take such measures for the ultimate and permanent disposal of the lands, including the fee, as might become appropriate in view of changing conditions, the welfare of the Indians and the public interests.

The facts that the treaty does not say that the fee shall pass, that it makes no provision for patents, and does not relieve assignees from federal guardianship or subject them to state laws, or dissolve the tribe, or abridge its power to speak and act for its members, while it does expressly provide that all the lands, assigned and unassigned, shall remain an Indian reservation, subject to the Indian trade and intercourse laws of Congress, and upon which white persons, other than federal employees, shall not be allowed to reside or go without written permission from the Indian agent or a superior officer, confirm this construction of Article IV.

This construction also is confirmed by the practical construction placed upon the treaty by the United States and the tribe, as evidenced by the terms of the certificates of assignment, the petition of a number of the assignees, including chiefs who had participated in the treaty, for a better tenure, the passage of the Act of August 7, 1882, c. 434, 22 Stat. 341, to become operative when consented to by the tribe, the acceptance of that act by the tribe, and the execution of the act through the surrender and accounting for outstanding certificates of assignment, and the making and acceptance of allotments under it—a construction of the treaty which has become practically a part of it and could not be now rejected without seriously disturbing the titles of those who not unreasonably relied upon it.

Possessory rights based on assignments made under Article IV of the treaty of 1865, *supra*, were terminated by the Act of 1882, *supra*. An assignee who failed to exercise his preferred right of selection waived it, and his assigned tract became allottable to any other qualified selector.

The provision in § 4 of the Act of August 7, 1882, *supra*, that "any right in severalty acquired by any Indian under existing treaties shall not be affected by this act" was not intended to qualify the plan of allotment defined in § 5, but only to prevent the sale under the earlier and separable portion of the act of tracts subject to Indian rights in severalty acquired under treaties.

A patent for an allotment issued under the Act of August 7, 1882, *supra*, in the name of an Indian who was dead at the time, inures to the benefit of his heir under § 2448, Rev. Stats.; the fact that the patentee had died before requisite proceedings had been taken

upon his selection would not render the patent void but at most voidable in an appropriate proceeding. Such a patent cannot be attacked by a mere occupant of the allotment in an action brought by the United States and the patentee's heir to recover damages for wrongful use and occupation of the premises.
222 Fed. Rep. 593, reversed.

THE case is stated in the opinion.

*The Solicitor General* for the United States.

*Mr. Hiram Chase, pro se,* and *Mr. Thomas L. Sloan,* with whom *Mr. William R. King* was on the brief, for respondent.

*Mr. O. C. Anderson* and *Mr. Charles J. Kappler,* by leave of court, filed a brief as *amici curiæ.*

*Mr. Harry L. Keefe,* by leave of court, filed a brief as *amicus curiæ.*

MR. JUSTICE VAN DEVANTER delivered the opinion of the court.

This is an action to recover for the wrongful use and occupancy of forty acres of land in Nebraska to which two Omaha Indians assert conflicting claims. The land is within the Omaha Indian Reservation, was assigned in 1871 under the treaty of March 6, 1865, 14 Stat. 667, to Clarissa Chase, a member of the Omaha tribe, and was allotted in 1899 under the Act of August 7, 1882, c. 434, 22 Stat. 341, to Reuben Wolf, another member of the tribe. The defendant, who has been using and occupying the land for some time, claims as the sole heir of Clarissa Chase, and the other claimant—for whom the United States sues as trustee and guardian—claims as the sole heir of Reuben Wolf. In the District Court judgment went against the defendant, but he prevailed in the Cir-

cuit Court of Appeals. 222 Fed. Rep. 593. Whether
the assignment to Clarissa Chase under the treaty passed
the full title in fee or only the Indian right of occupancy,
and whether all right under the assignment was extin-
guished prior to the allotment to Reuben Wolf under the
Act of 1882, are the controlling questions.

The reservation was established and maintained under
early treaties as the tribal home. The Indian right of
possession was in the tribe and the fee in the United States.
The possessory right was enjoyed by all the members in
common, none having a several right in any part of the
reservation. While this was so the treaty of 1865 was
negotiated. By it the tribe ceded a portion of the reser-
vation to the United States and the latter, in considera-
tion of the cession, engaged to make certain payments
to the Indians and to take certain measures, not material
here, for their benefit. The treaty then proceeded:

"Article IV. The Omaha Indians being desirous of
promoting settled habits of industry and enterprise
amongst themselves by abolishing the tenure in common
by which they now hold their lands, and by assigning
limited quantities thereof in severalty to the members
of the tribe, including their half or mixed blood relatives
now residing with them, to be cultivated and improved
for their own individual use and benefit, it is hereby agreed
and stipulated that the remaining portion of their present
reservation shall be set apart for said purposes; and that
out of the same there shall be assigned to each head of a
family not exceeding one hundred and sixty acres, and
to each male person, eighteen years of age and upwards,
without family, not exceeding forty acres of land—to
include in every case, as far as practicable, a reasonable
proportion of timber; six hundred and forty acres of said
lands, embracing and surrounding the present agency
improvements, shall also be set apart and appropriated
to the occupancy and use of the agency for said Indians.

The lands to be so assigned, including those for the use of the agency, shall be in as regular and compact a body as possible, and so as to admit of a distinct and well-defined exterior boundary. The whole of the lands, assigned or unassigned, in severalty, shall constitute and be known as the Omaha reservation, within and over which all laws passed or which may be passed by Congress regulating trade and intercourse with the Indian tribes shall have full force and effect, and no white person, except such as shall be in the employ of the United States, shall be allowed to reside or go upon any portion of said reservation without the written permission of the superintendent of Indian affairs or the agent for the tribe. Said division and assignment of lands to the Omahas in severalty shall be made under the direction of the Secretary of the Interior, and when approved by him, shall be final and conclusive. Certificates shall be issued by the Commissioner of Indian Affairs for the tracts so assigned, specifying the names of the individuals to whom they have been assigned respectively, and that they are for the exclusive use and benefit of themselves, their heirs, and descendants; and said tracts shall not be alienated in fee, leased, or otherwise disposed of except to the United States or to other members of the tribe, under such rules and regulations as may be prescribed by the Secretary of the Interior, and they shall be exempt from taxation, levy, sale, or forfeiture, until otherwise provided for by Congress."

Some of the Omahas sought and received assignments under this article, while others, although having the requisite status, neither sought nor received anything under it. Clarissa Chase was among those who obtained an assignment of 160 acres as the head of a family, and in 1870 a certificate evidencing her assignment was issued to her by the Commissioner of Indian Affairs. The 160 acres included the 40 acres now in question.

Without any doubt the fourth article contains provisions which, in other situations, would suggest a purpose to pass the full title in fee. This is true of the provisions that the assignments, when approved by the Secretary of the Interior, "shall be final and conclusive," that the certificates to be issued by the Commissioner of Indian Affairs shall specify that the tracts assigned are for the exclusive use and benefit of the assignees, "their heirs and descendants," and that the tracts shall not be "alienated in fee, leased, or otherwise disposed of except to the United States or to other members of the tribe." But as applied to the situation then in hand these provisions are consistent with a purpose to apportion the Indian possessory right, leaving the fee in the United States as before. The assignments, when approved, could well operate as a final and conclusive apportionment of that right without affecting the fee; and the right of each assignee to occupy and use the tract assigned to him, to the exclusion of other members, could well pass to his heirs and descendants, upon his death, without his being invested with the fee. If not invested with it, he, of course, could not alienate it, and a cautious provision intended to prevent him from attempting to do so hardly would enlarge his right. True, the provision says, "except to the United States or to other members of the tribe," but, as the restriction is also directed against leasing or other disposal, it is not improbable that the real purpose of the excepting clause is to qualify this part of the restriction. In any event, the implication attributed to the provision is too uncertain to afford a substantial basis for thinking the assignee was to take the fee.

Other provisions and considerations suggest that an apportionment of the tribal possessory right is all that was intended. The article directly provides for a change in tenure—an "assignment or division" in severalty of communal property. Nothing is said about passing the

fee held by the United States, and there is no provision for patents. The assignees are neither relieved from federal guardianship nor subjected to state laws. And there is no dissolution of the tribal organization, nor any abridgment of the accustomed power of the tribe, as such, to speak and act for its members. But there is express provision that all the lands, assigned and unassigned, shall remain an Indian reservation over which the Indian trade and intercourse laws of Congress shall be in force, and upon which no white person, not in the employ of the United States, shall be allowed to reside or go without written permission from the Indian agent or a superior officer. All this persuasively points to the absence of any purpose to do more than to individualize the existing tribal right of occupancy.

A like question was presented and considered in *Veale* v. *Maynes*, 23 Kansas, 1, a case arising out of the treaties of 1861 and 1867 with the Pottawatomie Indians. The earlier treaty provided in language similar to that now under consideration for the assignment of portions of the tribal reservation to individual members in severalty and for the issue by the Commissioner of Indian Affairs of certificates for the assigned tracts, "specifying the names of the individuals to whom they have been assigned, respectively, and that said tracts are set apart for the perpetual and exclusive use and benefit of such assignees and their heirs." Assignments were made and certificates issued under that treaty and thereafter the treaty of 1867 was negotiated. Following its provisions a tract assigned under the earlier treaty to one member was conveyed by a patent in fee to another. This was claimed to be violative of the right conferred by the assignment, but the right under the patent was sustained. Speaking for the Supreme Court of Kansas, and particularly referring to the earlier treaty, Mr. Justice Brewer, then a member of that court, said:

"Now what was intended by this division—that the title be thus divided up, or the mere matter of occupancy? Of course either was within the power of the contracting parties. They might provide for a division among the several Indians which should vest an absolute title in each, beyond the power of the tribe or the government to disturb without the personal consent of the individual; or they might provide for an individualizing of the right of occupancy, giving to each person a sole right of occupancy in a particular tract, a right guaranteed against invasion by any individual, but still within the power of the tribe as a tribe to convey by treaty. In other words, while that remained the tribal home each individual desiring it should have separate control of certain lands, yet subject to the ultimate power of the tribe to change their home and to make absolute conveyance of the whole body of lands. The power of the tribe, *as a tribe*, remained undisturbed over both the allotted lands and those held in common. That this was the intent and effect of the treaty, we are constrained to hold, and this notwithstanding many expressions which, if used in ordinary contracts between individuals, would have marked significance to the contrary.

" . . . At present it is enough to notice that the allottee remained a member of the tribe, and if the intention had been to enlarge his title from the ordinary Indian title, one of occupancy, to that of a fee-simple, the intention would, it seems, have been expressed in unmistakable terms. If, on the other hand, a difference was to be made in the mere manner in which the various Indians occupied the tribal home, it was enough that that difference was made clear, and language used to indicate that should not be carried to some further meaning."

In *Wiggan* v. *Conolly*, 163 U. S. 56, 63, where the rights of an allottee, who was still a tribal Indian, were restricted by treaty after the allotment was made, this court said:

"The land and the allottee were both still under the charge and care of the Nation and the tribe, and they could agree for still further protection, a protection which no individual was at liberty to challenge."

But if the terms of the treaty of 1865 be regarded as confused or uncertain the question still must be resolved in the same way, for the parties—the United States and the tribe—have in practice placed upon the treaty the construction to which we are inclined. In the certificates issued by the Commissioner of Indian Affairs and accepted by the assignees it was declared that "the said [assignee] is entitled to and may take immediate possession of said land and occupy the same, and the United States guarantees such possession, and will hold the title thereto in trust for the exclusive use and benefit of [the assignee] and—heirs so long as such occupancy shall continue." The obvious import of this is that the assignee was to have a right of occupancy, but not the fee. In January, 1882, a considerable number of the assignees, some being chiefs who had participated in the negotiation of the treaty and whose names were signed to it, memorialized Congress as follows (Sen. Misc. Doc., No. 31, 47th Cong., 1st sess.):

"We, the undersigned, members of the Omaha tribe of Indians, have taken out certificates of allotment of land, or entered upon claims within the limits of the Omaha reserve. We have worked upon our respective lands from three to ten years; each farm has from five to fifty acres under cultivation; many of us have built houses on these lands, and all have endeavored to make permanent homes for ourselves and our children.

"We therefore petition your honorable body to grant to each one a *clear and full title* to the land on which he has worked.

"We earnestly pray that this petition may receive

your favorable consideration, for we now labor with
discouragement of heart, *knowing that our farms are not
our own, and that any day we may be forced to leave* the
lands on which we have worked. We desire to live and
work on these farms where we have made homes, that
our children may advance in the life we have adopted.
To this end, and that we may go forward with hope and
confidence in a better future for our tribe, *we ask of you,
titles to our lands."*

Shortly after the presentation of this memorial a bill
providing for the sale of the western part of the Omaha
Reservation passed the Senate. At that time the only
provision in the bill having any possible reference to the
existing assignments was a saving clause in its fourth
section declaring that "any right in severalty acquired
by any Indian under existing treaties shall not be affected
by this act." In the House of Representatives four new
sections were added, and in that form the bill became the
Act of August 7, 1882, before cited. The new sections,
5 to 8, contain elaborate provisions for making allotments
in severalty out of the unsold portion of the reservation,
for adjusting the situation to which the Indian memorial
invited attention, for the issue of trust patents and pat-
ents carrying the fee, for disposing of the surplus lands
in the reservation and for ultimately bringing the Indians
within the operation of state laws. The fifth section, the
one providing for allotments and dealing with the existing
assignments, was both comprehensive and easily under-
stood. It was in the nature of a proposal and in terms
required "the consent of the Omaha tribe of Indians,
expressed in open council," to make it operative. Shortly
stated, what it proposed was this: All unsold lands, in-
cluding those theretofore assigned under the treaty of
1865, were to be available for allotments. The right to
receive allotments was to be accorded to the members
generally, including those holding assignments under the

treaty.  The allotments were to be on a scale [1] of 160 acres to each head of a family, 80 acres to each single person over eighteen years of age, 80 acres to each orphan child under eighteen years and 40 acres to each other person under eighteen years.  The Indians were severally to select the lands to be allotted to them, heads of families selecting for their children and the agent selecting for orphan children.  These allotments were to be "deemed and held to be in lieu of" the assignments under the treaty of 1865, but each assignee, when selecting the lands to be allotted to him, was to be accorded "a preference right" to select the tract embracing his improvements.  In short, all rights under the assignments, as such, were to be extinguished, and each assignee was to have the same right to take an allotment as was accorded to other members, but with a preferred right to make his selection in such way that his allotment would include his improvements. The sixth section provided for the issue of trust patents covering a period of twenty-five years, and for full patents conveying the fee at the end of that period.

. The tribe, in open council, gave its consent to this plan of allotment and adjustment, and, through the cooperation of the administrative officers and the tribe, the plan was carried to completion.  The report of the allotting agent shows that of the 297 outstanding certificates of assignment 230 were produced and surrendered and 67 were accounted for as lost by fire, flood or other accident, and that most of the certificate holders took the assigned tracts for their allotments—others selecting different lands.  Thus it is apparent that the parties to the treaty—the United States and the tribe—have in all their dealings relating to the subject proceeded upon the theory that what was intended by Article IV and what

---

[1] The quantity of some of the allotments was subsequently enlarged with the consent of the tribe.  C. 209, 27 Stat. 630.

was accomplished by the assignments under it was merely
a distribution or apportionment of the tribal right of
occupancy, leaving the fee in the United States and leav-
ing the United States and the tribe free to take such meas-
ures for the ultimate and permanent disposal of the lands,
including the fee, as might become essential or appropriate
in view of changing conditions, the welfare of the Indians
and the public interests. This construction of the treaty
by those who entered into it and to whom its proper ad-
ministration and application were of obvious importance
has become practically a part of it and could not be re-
jected now, after the lapse of many years, without seri-
ously disturbing the titles of those who, not unreason-
ably, relied upon it.

Concluding, as we do, that the assignment to Clarissa
Chase passed only the Indian or tribal right of occupancy,
the remaining question is not difficult of solution. She
took that right as it was held by the tribe, without en-
largement or diminution. It was merely individualized.
Upon her death, in 1875, it passed to the defendant, he
being her sole heir. The Act of 1882, consented to by
the tribe, put into effect a general plan of allotment
which completely displaced the Indian right of occu-
pancy and in that sense terminated all right under the
assignment. Under that plan the assigned tract was
available for allotments and the defendant was entitled
to an allotment. He could select the assigned tract for
his allotment—indeed, he had a preferred right to do so.
He could exercise that right or waive it and select other
lands. But he could not select other lands and also hold
the assigned tract. He was entitled to one allotment,
not two. If not selected by him, the tract in question
would be open to selection by another. He does not
assert that he selected it, or that he was denied the right
to do so, or that he received less than a full allotment
without this tract. But he claims that the assignment

passed the title in fee and in consequence was an insurmountable obstacle to the allotment of the tract under the Act of 1882. This claim, as has been shown, is untenable. All that passed by the assignment was a possessory right, and this was terminated by the Act of 1882.

Some reliance is had upon the provision in § 4 that "any right in severalty acquired by any Indian under existing treaties shall not be affected by this act." But this, as an examination of the act discloses, is merely a saving clause in that part of the act providing for the sale of a distinct portion of the reservation. If the provision be read in connection with what is said in § 5 in dealing with allotments and with assignments under the treaty it becomes manifest that it was not intended to interfere with or qualify the plan of allotment as defined in that section, but only to prevent the sale, under the earlier and separable portion of the act, of any tract to which an Indian had a right in severalty under a treaty. The legislative history of the act also sustains this view. See Cong. Rec., 47th Cong., 1st sess., pp. 3028–3032, 3077–3079.

According to the pleadings, Reuben Wolf died at some time after selecting the tract for his allotment and before the issue of the patent in his name, and this is set up as an obstacle to a recovery on behalf of his heir. If there be any merit in this objection, it does not render the patent void but only voidable. A statute in force for many years, and which this court has applied to a patent issued under an Indian treaty for Indian lands, provides that where the person to whom the patent issues is dead at the time the title shall inure to and become vested in his heirs, devisees or assigns, as if the patent had issued in his lifetime. Rev. Stats., § 2448; *Crews* v. *Burcham*, 1 Black, 352, 357. Thus the fact that Reuben Wolf was dead when the patent issued is in itself of no moment. If his selection had not advanced before his death to the

point where the patent properly could be issued thereafter that is a matter of which only the United States and the tribe can complain—and then only in an appropriate proceeding.  Apparently both are content to let the patent stand, and certainly it is not open to the defendant to make the objection.

It results that the judgment of the Circuit Court of Appeals must be reversed and that of the District Court affirmed.

*It is so ordered.*