REQUESTED BY: Mr. Michael J. Linder Director, Nebraska Department of Environmental Quality
We view your request dated May 8, 2001, as asking the following two questions:
 1. Whether or not a Statement given by Attorney General Clarence Meyers on September 19, 1973, included a jurisdictional statement on the State's authority to regulate water discharge facilities on non-Indian-owned land within the exterior boundaries of a reservation; and
 2. Whether our office can supplement the September 19, 1973, Statement to include a Statement concerning the State's authority to regulate non-Indians on non-Indian-owned land within the exterior boundaries of a reservation.
Our short response to the first question is that the September 19, 1973, Statement does not include a jurisdictional Statement as to the State's authority to regulate water discharge facilities on non-Indian-owned land within the exterior boundaries of a reservation. Our short response to the second question is that we are unable to supplement the Statement as you have requested.
 First Question
You have requested that we clarify the Attorney General's Statement dated September 19, 1973, submitted by former Attorney General Clarence Meyers (hereinafter referred to as "the Statement"). The Statement was issued in order to obtain delegation from the United States Environmental Protection Agency (EPA) for the Nebraska Department of Environmental Control (presently known as the Department of Environmental Quality) to administer and enforce the provisions of the National Pollutant Discharge Elimination System (NPDES) under Section 402 of the Federal Water Pollution Control Act Amendments of 1972. The Statement certified that Nebraska laws and regulations provided authority for the Department of Environmental Control to carry out a permit program for the discharge of pollutants by new and existing point sources to the same extent as required under the NPDES program administered by EPA. Nebraska's program was approved on June 12, 1974. The municipal waste water treatment plants (WWTP) in Walthill and Pender, Nebraska were identified in the Statement as needing NPDES permits.
In 1993 the EPA issued notice in the Federal Register that the EPA had never expressly authorized any State to operate an NPDES permit program on Indian lands despite the fact that some States had issued permits in Indian land. In Nebraska some of these NPDES permits in Indian land have been issued and reissued three times or more. In 1997 the Nebraska Department of Environmental Quality (DEQ) proposed to issue NPDES permits to the Walthill and Pender WWTPs. Both Walthill and Pender appear to be within the exterior boundaries of the Omaha Reservation. EPA raised objections to DEQ issuing NPDES permits to the Walthill and Pender WWTPs. These objections were reaffirmed after a public hearing by the Director of the Water, Wetlands and Pesticides Division of the EPA, on April 13, 2001. It is the EPA's contention that the state of Nebraska was not given the authority to issue NPDES permits within the exterior boundaries of reservations.
It appears that in 1973 and 1974 neither the EPA nor this Office contemplated that there would be a need to have a jurisdictional statement regarding the State's environmental regulatory authority in Indian land. The Statement was made on a form provided by the EPA. Nowhere on the form was there a space to list the State's authority within the exterior boundaries of an Indian Reservation. The State's regulatory authority in Indian country did not appear to be an issue with the EPA until 1993. It also appears that in 1973-75 the EPA may have believed that the State had civil regulatory authority over reservations based upon Public Law 280. The U.S. Supreme Court determined in Bryan v.Itaska, 426 U.S. 373 (1976), that Public Law 280 did not give states civil regulatory authority in Indian country. The EPA did not object to the State issuing NPDES permits to the Walthill and Pender WWTPs until 1997.
The answer to your first question is that the Statement does not address the State's authority to regulate non-Indians on non-Indian owned land within an Indian Reservation. Neither the EPA nor this office believed that such a jurisdictional question needed to be addressed when the Statement was issued on September 19, 1973.
Second Question
You also have requested that we issue a supplement to the Statement which indicates the extent of the State's authority to regulate non-Indians on non-Indian owned land within the exterior boundaries of the tribal reservation. We are unable to give a definitive supplement to the Statement on the State's authority to regulate non-Indians on non-Indian owned land within the boundaries of tribal reservations. We are unable to do so because it appears to us that in the balancing of the state, federal, and tribal interests in enforcing environmental regulations, the tribal interest outweighs the State's. We reach this conclusion based upon the policy adopted by Congress and the courts against "checkerboard jurisdiction" on Indian land and the tribe's inherent authority to control conduct that poses a risk to the tribe's health or welfare.
 Policy Against Checkerboard Enforcement
The EPA uses the definition of Indian country found in18 U.S.C. § 1151 to describe what constitutes Indian land. Section 1151 defines Indian country as follows:
 (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation;
 (b) all dependent Indian communities within the borders of the Unites States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state; and c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.
In Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351
(1962), the Court stated the following regarding its interpretation of § 1151(a) as applied to the state's criminal jurisdiction on non-Indian owned land within a reservation:
For that argument rests upon the fact that where the existence or nonexistence of an Indian reservation, and therefore the existence or nonexistence of federal jurisdiction, depends upon the ownership of particular parcels of land, law enforcement officers operating in the area will find it necessary to search tract books in order to determine whether criminal jurisdiction over each particular offense, even though committed within the reservation, is in the State or Federal Government. Such an impractical pattern of checkerboard jurisdiction was avoided by the plain language of § 1151 and we see no justification for adopting an unwarranted construction of that language where the result would be merely to recreate confusion Congress specifically sought to avoid.
Seymour, 368 U.S. at 358. Such reasoning has been applied with equal force to an environmental regulation question on Indian Land.
In Arizona Public Service Company v. Environmental ProtectionAgency, 211 F.3d 1280(C.A.D.C) cert. denied, ___ U.S. ___, 121 S.Ct. 1600
(2000), the court found that the tribe had the authority pursuant to a congressional delegation found at 42 U.S.C. § 7601(d)(1)(A) to regulate the air quality on all land within the reservations, including fee land held by private landowners who are not tribe members. When the EPA promulgated rules to implement the 1990 Amendments of the Clean Air Act, they found the 1990 Amendments were a delegation of federal authority to regulate air quality to Native American Nations within the boundaries of reservations, regardless of whether the land is owned by tribes. The court rejected the Arizona Public Service Company's contention that the delegation to the tribe did not include the Tribe's authority to regulate land owned by non-tribal members. "Accepting petitioners' interpretation of the 1990 Amendments would result in a `checkerboard' pattern of regulation within a reservation's boundaries that would be inconsistent with the purpose and provisions of the Act."Arizona Public Service Company, 211 F.3d at 1258.
 Inherent Authority of the Tribe Over Conduct of Nonmembers that Threatens the Health Or Welfare of the Tribe.
Our second reason for determining the State may lack authority to regulate under the NPDES permit program on reservation land owned in fee by nonmembers of the tribe is the inherent authority of the tribe to regulate non-members' conduct within the exterior boundaries of the reservation. For the most part a tribe will lack authority to regulate non-members on reservation land owned in fee by nonmembers of the Tribe. In Montana v. U.S., 450 U.S. 544 (1981) the Crow Tribal Council passed a resolution prohibiting hunting and fishing within the reservation by anyone who was not a member of the Tribe. The State of Montana continued to assert its authority to regulate hunting and fishing by non-Indians within the reservation. The Court resolved the question of when a tribe had exclusive jurisdiction over the on-reservation activities of nonmembers on land owned in fee by nonmembers of the tribe.
"The areas in which such implicit divestiture of sovereignty has been held to have occurred are those involving the relations between anIndian tribe and nonmembers of the tribe . . ."
These limitations rest on the fact that the dependent status of Indian tribes within our territorial jurisdiction is necessarily inconsistent with their freedom independently to determine their externalrelations. But the powers of self-government, including the power to prescribe and enforce internal criminal laws, are of a different type. They involve only the relations among members of a tribe. Thus, they are not such powers as would necessarily be lost by virtue of a tribe's dependent status. Ibid. (Emphasis added.)
Montana, 450 U.S. at 564 citing to United States v. Wheeler, 435 U.S. 313,326. The Court found that in the absence of express authorization by federal statute or treaty, tribal authorities typically would not have jurisdiction over non-members within the reservations boundaries except for two situations. One is where a non-member enters into a consensual relationship with the tribe. Montana, 450 U.S. 565. The second situation is when the conduct of non-members "threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe." Montana, 450 U.S. at 565. The Court did not find that the regulation of hunting and fishing on reservation land owned in fee by nonmembers of the Tribe represented a threat to the political integrity, the economic security, or the health or welfare the tribe.
Thus in the situations where the tribe has inherent authority to regulate non-members on reservation land owned in fee by nonmembers of the Tribe, the State will lack the authority to regulate. Where the tribe does not have the authority by congressional delegation, treaty or inherent authority to regulate nonmembers on reservation land owned in fee by nonmembers of the tribe, the State is free to regulate. SinceMontana the Court has determined that the threat to the tribe's political integrity, economic security, or health, or welfare must be serious and substantial for the tribe's inherent authority to exist. Brendale v.Confederated Yakima Nation, 492 U.S. 408, 431, 447 (1989) and Strate v.A-1 Contractors, 520 U.S. 438, 453 (1997). In Strate the Court rejected the idea that careless driving on roadways within the reservation amounted to enough of a threat to the safety of the tribe to invoke the Tribe's inherent authority over nonmembers who were involved in an accident on the highway within the exterior boundaries of the reservation.
. . . Undoubtedly, those who drive carelessly on a public highway running through a reservation endanger all in the vicinity, and surely jeopardize the safety of tribal members. But if Montana's second exception requires no more, the exception would severely shrink the rule. Again, cases cited in Montana indicate the character of the tribal interest the Court envisioned.
The Court's statement of Montana's second exceptional category is followed by citations of four cases, ibid; each of those cases raised the question whether a State's (or Territory's) exercise of authority would trench unduly on tribal self-government. In two of the cases, the Court held that a State's exercise of authority would so intrude, and in two, the court saw no impermissible intrusion.
The Court referred first to the decision recognizing the exclusive competence of a tribal court over an adoption proceeding when all parties belonged to the Tribe and resided on its reservation. See Fisher [v.District Court, 424, U.S. 382,] 386, 96 S.Ct., At 946, supra, at 12. Next, the Court listed a decision holding a tribal court exclusively competent to adjudicate a claim by a non-Indian merchant seeking payment from tribe members for goods bought on credit at an on-reservation store. See Williams [v. Lee], 358 U.S. at 220, 79 s.Ct. At 270-271 ("[A]bsent governing Acts of Congress, the question [of state-court jurisdiction over on-reservation conduct] has always been whether the state action infringed on the right of reservation Indians to make their own laws and be ruled by them."). Thereafter, the Court referred to two decisions dealing with objections to a county or territorial government's imposition of a property tax on non-Indian-owned livestock that grazed on reservation land; in neither case did the Court find a significant tribal interest at stake. See Montana Catholic Missions v. Missoula County,200 U.S. 118, 128-129, 26 S.Ct. 197, 200-201, 50 L.Ed. 398 (1906) ("the Indians' interest in this kind of property [livestock], situated on their reservations, was not sufficient to exempt such property when owned by private individuals, from [state or territorial] taxation"); Thomas v.Gay, 169 U.S. 264 169 U.S. 273, 18 S.Ct. 340, 343, 42 L.Ed. 740 (1898) ("[territorial] tax put upon the cattle of [non-Indian] lessees is too remote and indirect to be deemed a tax upon the lands or privileges of the Indians").
Strate, 520 U.S. at 458-459.
In 1987 Congress amended the Clean Water Act to provide that federally-recognized Indian tribes may be treated in the same manner as states for a number of purposes, including administering the NPDES permitting program. 33 U.S.C. § 1377 (e). Regulations governing authorization of the NPDES program to Indian tribes were promulgated in 1993, and are found at 40 C.F.R. § 131.8. The EPA regulations require the following for a Tribe to obtain treatment as state status:
 The tribe must be federally recognized and exercising governmental authority;
 The tribe must have a governing body carrying out "substantial governmental duties and powers;"
 The water quality standards program which the tribe seeks to administer must "pertain to the management and protection of water resources," which are "within the borders of an Indian reservation;"
 The Indian tribe is reasonably expected to be capable of carrying out the functions of an effective water quality standards program in a manner consistent with the terms and purposes of the Clean Water Act and regulations.
 40 C.F.R. § 131.8(a). EPA requires that the tribe show that the regulated activities affect "the political integrity, the economic security, or the health or welfare of the tribe." Final Rule, 56 Fed. Reg. At 64,877, (quoting Montana v. U.S., 450 U.S. at 565). Additionally, the potential impacts of regulated activities on the tribe must be "serious and substantial." 56 Fed. Reg. at 64,878. No tribe in Nebraska has yet received TAS status. EPA will issue the NPDES permits within the exterior boundaries of the reservation when neither the tribe nor the state have been given that authority.
In Montana v. United States Environmental Protection Agency,
137 F.3d 1136, (9th Cir.) cert. denied 525 U.S. 921 (1998), the court upheld the grant of treatment-as-state (TAS) status to the Confederate Salish and Kootenai Tribes under the Clean Water Act. The EPA's grant of TAS status to the tribes allowed the tribes to establish water quality standards for the reservation, including land owned by non-members. The State of Montana objected to the tribes' jurisdiction over non-member-owned land within the reservation. The land within the Flathead Reservation reflects a pattern of mixed ownership and control between tribal and non-tribal entities. The court found that the Confederate Salish and Kooentai Tribes had the inherent authority to regulate the water based upon the tribes' inherent sovereignty.
In their application for TAS status, the Tribes identified several facilities on fee lands within the Reservation that have the potential to impair water quality and beneficial uses of tribal waters. These include feedlots, dairies, mine tailings, auto wrecking yards and dumps, construction activities and landfills. Other actual or potential point sources include wastewater treatment facilities, commercial fish ponds and hatcheries, slaughterhouses, hydroelectric facilities and wood processing plants.
Montana v. U.S. EPA, 137 F.3d at 1139-1140. The court agreed with the EPA that the activities of non-members posed such a serious and substantial threat to Tribal health and welfare that Tribal regulation was essential.
Neither the EPA nor the Ninth Circuit required the tribe to make a significant showing that potential pollutants to water could pose a substantial and serious threat to the Tribal health and welfare. In fact the court stated the following about the necessary showing:
EPA believes that tribes will normally be able to demonstrate that the impacts of regulated activities are serious and substantial due to "generalized findings" on the relationship between water quality and human health and welfare. See id. Nonetheless, under the Final Rule EPA will make a case-specific determination on the scope of each tribal applicant's authority. See id. Because EPA's generalized findings will be incorporated into the analysis of tribal authority, the factual showing required under § 131.8 is limited to the tribe's assertion that (1) there are waters within the reservation used by the tribe, (2) the waters and critical habitat are subject to protection under CWA, and (3) impairment of waters would have a serious and substantial effect on the health and welfare of the tribe. See id. At 64, 7879.
Montana v. U.S. EPA, 137 F.3d at 1139.
It is our understanding that the Pender WWTP discharges into the Logan Creek Dredge. The Logan Creek Dredge runs mostly through fee land but does run through a small parcel of allotted land within the exterior boundary of the Omaha Reservation. The Walthill WWTP discharges into the South Omaha Creek, which runs north about five miles before crossing into the Winnebago Reservation. The South Omaha Creek appears to mostly cross fee land, but does also cross allotted land and tribal trust land. We believe the EPA and Ninth Circuit Court of Appeals reasoning in Montanav. U.S. EPA would weigh against state regulation of the waters in Logan Creek Dredge and the South Omaha Creek to the extent the bodies of water are within the exterior boundaries of the Omaha Reservation.
Additionally, in City of Albuquerque v. Browner, 97 F.3d 415 (10th Cir. 1996), the court affirmed the tribe's ability to establish more stringent standards than the federal ones when the tribe had obtained TAS status. The challenge arose when the city learned that EPA was in the process of revising the city's NPDES permit to meet the reservations's standards. The city was not in the reservation but its waste treatment facility dumped into the river five miles upstream from the reservation. The court upheld EPA's ability to enforce the tribe's more stringent standards on the city of Alburquerque despite the fact it was outside of the exterior boundaries of the reservation.
 Has The Omaha Reservation Been Diminished?
We do believe a question exists as to whether Pender and Walthill are within the exterior boundaries of the Omaha Reservation. First, on August 7, 1882, the Omaha Reservation was diminished by a Congressional act which approved of an Agreement with the Omaha Tribe and the Secretary of the Interior made in 1880. In the 1880 Agreement the Omaha Tribe agreed to authorize the Secretary of the Interior to cause to be sold to settlers the portion of the Omaha Reservation to the west of the Sioux City and Nebraska Railroad right-of-way, now the Chicago, St. Paul, Minneapolis, Omaha Railroad. 22 Stat. 34. The Bureau of Indian Affairs has made note of such a diminishment on a map of the Omaha Reservation the Bureau created on October 6, 1964. See also, South Dakota v. YanktonSioux Tribe, 522 U.S. 329 (1998) (the Court found the Yankton Sioux Reservation was diminished by an 1894 Act of Congress which approved of an Agreement with the Yankton Sioux Tribe to cede unallotted land to the United States for settlement). A large portion of Pender lies outside the diminished boundaries of the Omaha Reservation as a result of the 1882 Act. However, it is our understanding that the Pender WWTP in question lies on the right-of-way of the railroad and would therefore be within the reservation land that was not severed by the 1882 Act.
There may be an argument that the Omaha Reservation has been further diminished beyond the severed land mentioned in the 1882 Act. Recently, the Eighth Circuit Court of Appeals found that the Yankton Sioux Reservation has been diminished beyond the land ceded by the Tribe in an 1892 Agreement that was ratified by Congress in 1894. Yankton Sioux Tribev. Gaffey, 188 F.3d 1010 (8th Cir. 1999) cert. denied 530 U.S. 1261
(2000). South Dakota argued to the district court that the Yankton Sioux Reservation had been disestablished by the 1894 Act. The Eighth Circuit Court of Appeals rejected South Dakota's contention on the disestablishment of the reservation. "If Congress' general understanding that tribal ownership was a necessary component of reservation status controlled, all land which passed out of tribal ownership would necessarily be found to have lost its reservation status-a conclusion the Supreme Court has explicitly refused to adopt." Yankton,188 F.3d at 1023, citing to Solem, 465 U.S. at 4698-469, 104 S.Ct. 1161. However, the court did find that the Yankton Sioux Reservation had been diminished beyond the ceded land identified in the 1894 Act.
The court in Yankton looked at legislative intent at the time the 1894 act was passed and historically what the parties believed at the time.
Congressional intent is the touchstone for analyzing whether the 1894 Act altered the status of the nonceded lands. See Rosebud SiouxTribe,430 U.S. at 586, 97 S.Ct. 1361. After land is set aside for an Indian reservation, it retains that status until Congress explicitly indicates otherwise. See Solem, 465 U.S. at 470, 104 S.Ct. 1161. Intent to diminish or disestablish a reservation must be "clear and plain."United States v. Dion, 476 U.S. 734, 738, 106 S.Ct. 2216, 9090 L.Ed.2d 767 (1986). Such an intent must be "expressed on the face of the Act or be clear from the surrounding circumstances and the legislative history. Whether Congress intended to disestablish the reservation completely, or whether it intended all or some of the nonceded land to retain its reservation status is complicated by the fact that modern distinctions between different categories of Indian country were not recognized by nineteenth century legislators who had a different understanding of the requirements for land to be classified as reservation land and/or Indian Country.
Yankton, 188 F.3d at 1021.
Members of Congress in 1894 operated on a set of assumptions which are in tension with the modern definitions of Indian country, and the intentions of that Congress and of the 1892 negotiating parties are what we must look to here. At the turn of the century, Indian lands were defined to include "only those lands in which the Indians held some form of property interest: trust lands; individual allotments, and, to a more limited degree, opened lands that had not yet been claimed by non-Indians." Solem, 465 U.S. at 468, 104 S.Ct. 1161. Lands to which the Indians did not have any property rights were never considered Indian country. The notion of a reservation as a piece of land, all of which is Indian country regardless of who owns it, would have thus been quite foreign. Congress in the late nineteenth century was operating on the assumption that reservations would soon cease to exist. See id, and on the belief that allotting lands, and purchasing those left unallotted, were steps in the process of eventually dismantling the reservation system. See United States v. Southern Pacific Transp. Co., 543 F.2d 676,695 (9th Cir. 1976). The 1894 Congress would have felt little pressure to specify how far a given act went toward diminishing a reservation and would have had no reason to distinguish between reservation land and other types of Indian country. See id.
Yankton, 188 F.3d at 1022. The court found that the primary purpose of the 1892 agreement was to cede the unallotted surplus lands on the Yankton Sioux Reservation to the United States.
Additionally, the court recognized that the Commissioners who negotiated with the Yankton Tribe emphasized the perceived need for the Tribe to assimilate into the white culture. The court found that the Yankton Sioux Reservation was diminished beyond the ceded land for the following reasons:
In sum, the 1894 Act did not clearly disestablish the Yankton Sioux Reservation, but it intended to diminish the reservation by not only the ceded land, but also by the land which it foresaw would pass into the hands of the white settlers and homesteaders. The text of the 1894 Act, read in its full historical context, establishes that the intent was to cede certain lands to the United States and to open areas of the Yankton Sioux Reservation to white settlers, as well as to reserve land to be used to care for continued tribal interests. Until the Indian allottees would receive their lands in fee and the trust period over them would end, they could not convey land to non Indians. It was then foreseen that the trust period over the allotments would at some point come to an end, but we note that some of this allotted land apparently remains in trust to this very day.
Yankton, 188 F.3d at 1028.
The court also considered the treatment of the Yankton Sioux Reservation area in the years following the passage of the act, such as the fact the State had assumed primary jurisdiction over unallotted lands that had passed out of trust status. The court remanded the case to the district court to determine to what extent the Yankton Sioux Reservation had been further diminished beyond the ceded land identified in the 1894 Act.
Nebraska may be able to make an argument similar to South Dakota's in the Yankton case as to the diminishment of the Omaha Reservation. We do understand that the EPA and the Bureau of Indian Affairs will not agree with such a contention given their explicit finding that the Walthill and Pender WWTPs are within the exterior boundaries of the Omaha Resservation. See, EPA's Reaffirmation of Objections to State Issued Permits, Walthill and Pender, Nebraska, Appendix, p. 1, Response to Comments — Summary A.
In the Treaty With the Omaha, 1865, the Omaha Tribe ceded the northern portion of their reservation for the Winnebago Reservation for the sum of $50,000. In that same 1865 Treaty, Congress provided for the assignment of property to Omaha Tribal members and the discontinuation of the tenure in common by which the Omaha Tribe was then holding their land. Article 4 of the 1865 Treaty provided the following:
The Omaha Indians being desirous of promoting settled habits of industry and enterprise amongst themselves by abolishing the tenure in common by which they now hold their lands . . . The land to be so assigned, including those for the use of the agency, shall be in as regular and compact a body as possible, and so as to admit of a distinct and well-defined exterior boundary. The whole of the lands, assigned or unassigned, in severalty, shall constitute and be known as the Omaha reservation within and over which all laws passed or which may be passed by Congress, regulating trade and intercourse with the Indian tribes shall have full force and effect, and no white person, except such as shall be in the employ of the United States, shall be allowed to reside or go upon any portion of said reservation without written permission of the superintendent of Indian affairs or the agent for the tribe. Said division and assignment of lands to the Omahas in severalty shall be made under the direction of the Secretary of the Interior and when approved by him, shall be final and conclusive . . . and said tracts shall not be alienated in fee, leased, or otherwise disposed of except to the United States or to other members of the tribe . . .
Treaty with the Omaha, 1865, Article 4, 14 Stat. 667. In January 1882, a considerable number of Omaha assignees, memorialized Congress as follows:
"We, the undersigned, members of the Omaha tribe of Indians, have taken out certificates of allotment of land, or entered upon claims within the limits of the Omaha reserve. We have worked upon our respective lands from three to ten years; each farm has from five to fifty acres under cultivation; many of us have built houses on these lands, and all have endeavored to make permanent homes for ourselves and our children.
"We therefore petition your honorable body to grant to each one a clear and full title to the land on which he has worked.
"We earnestly pray that this petition may receive your favorable consideration, for we now labor with discouragement of heart, knowingthat our farms are not our own, and that any day we may be forced toleave the lands on which we have worked. We desire to live and work on these farms where we have made homes, that our children may advance in the life we have adopted. To this end, and that we may go forward with hope and confidence in a better future for our tribe, we ask of youtitles to our lands.
Unites States v. Chase, § 245 U.S. 89, 97-98 (1917), citing to Sen. Misc. Doc., No. 31, 47th Cong., 1st Sess. (Emphasis added). On August 17, 1882, Congress granted the Omaha Tribe's request and provided for allotments of Indian land wherein trust patents would issue and the tribal members would be able to acquire full patents to the land after 25 years. 22 Stat. 341. The 1882 Act also provided that at the conclusion of the 25 years, the tribal members would become subject to state law, both civil and criminal. As a result of the 1882 Act, 230 certificates of assignment were surrendered out of 297 outstanding certificates and most of the certificate holders took the assigned tracts for their allotments. Chase, 245 U.S. at 99.
In Chase, Jr. v. United States, 256 U.S. 1 (1920), the Court affirmed the denial of an Omaha Indian member's claim of his right to select an allotment from the Omaha Reservation based upon the Act of 1882, which was later amended in 1893. Section eight of the 1882 Act provided that the residue of lands that were not allotted would be patented to the tribe and held in trust for 25 years, and then said residue would be conveyed in fee discharged of the trust. However, section eight of the 1882 Act provided that from these lands held in trust by the tribe, allotments of one-sixteenth of a section should be made and patented to each Omaha child who might be born prior to the expiration of the 25 year trust period. No such patent of the residue land was ever issued to the Tribe. The 1893 Amendment provided that the Secretary of Interior was authorized with the consent of the Indian tribe to allot in severalty to each Indian woman and child of the tribe born since allotments of land were made and now living one-eighth of a section of the residue lands held by that tribe in common instead of one-sixteenth. C. 209, 27 Stat. 630. Chase was not born until after the 1893 act was passed.
On May 11, 1912, Congress authorized the Secretary of the Interior to sell all unallotted land within the Omaha Reservation to the highest bidder. C.121, 37 Stat. 111. In Chase, Jr., the Court held that the 1912 Act repealed the 1882 Act and the 1893 amendment to the extent they provided that the trust land that was to be held for the tribe would pass in allotments to children who were born during the trust period. The Court quoted the following from the Court of Appeals:
"The Secretary of the Interior, of course, could not allot the unallotted lands under the Act of 1882 and also sell them under the Act of 1912; nor could he allot the unallotted lands and at the same time make the reservations which he is commanded to make by section 2 of the latter act. It is so plain that both acts cannot be carried out that it is unnecessary to discuss that question."
Chase, Jr., 256 U.S. at 9. Section 2 of the 1912 Act provides the following:
That the Secretary of the Interior is hereby directed to reserve from sale under the terms of this Act, the following tracts of land for the purposes designated: Forty-nine acres of the land now used for agency purposes to be reserved for agency and school purposes for so long as the need thereof exists; ten acres to be selected by the tribe for use as a tribal cemetery; ten acres of the land now reserved for the use of the Presbyterian Church to be selected by the officials of said church for the use of the church so long as needed for religious or educational purposes; two acres of the land on which is standing what is known as the old Presbyterian mission building, patent in fee simple to issue therefor in the name of the State Historical Society of Nebraska: Provided, That of the land now reserved for agency purposes the Secretary of the Interior is directed to reserve and set aside for town-site purposes one hundred and sixty-four acres other than the forty-nine acres hereinbefore reserved, and shall cause the same to be surveyed and platted into town lots, streets, alleys, and parks, the lots to be appraised and sold under the terms of this Act, and the streets, alleys, and parks are herby dedicated to public use: Provided further, That the lands allotted, those retained or reserved and the surplus lands sold, set aside for town-site purposes, or otherwise disposed of, shall be subject for a period of twenty-five years to all of the laws of the United States prohibiting the introduction of intoxicants into the Indian country.
Ch. 121, 37 Stat. 111, § 2. Section 2 of the 1912 Act is significant to making a case for diminishment. The last sentence quoted from Section 2 indicates that it was indeed the intent of Congress to diminish the boundaries of the Omaha Reservation. If the identified properties were to remain within the reservation, this last sentence would be unnecessary. The laws of the United States prohibiting the introduction of intoxicants into the Indian country would be applicable without this provision. Both the U.S. Supreme Court and the Eighth Circuit Court of Appeals reached this conclusion as to the diminishment of the Yankton Sioux Tribe from a similar prohibition to the introduction of alcohol in the 1894 Act. Yankton, 118 S.Ct. At 801. "In this article the parties acknowledged the continued existence of two distinct categories of land to which different laws might apply." Yankton,188 F.3d at 1027.
The 1882 Act did not specify that the land west of the railroad right of way would remain a part of the reservation. The fact that the authorization of the Secretary of the Interior to sell these lands to settlers in the same act that anticipated the ending of the trust status of lands after twenty-five years, could support the view that the reservation was diminished. It appears that Congress was seeking to phase out its supervision of the Indian lands, it being only a matter of time before the Indians were to assume their role as ordinary citizens of the State.
 Summary
The answer to your first question is that the Statement does not include a jurisdictional statement as to the State's authority to regulate non-Indian owned land within the exterior boundaries of a reservation. Neither the EPA nor this office believed that such a question needed to be addressed in 1973. We are unable to supplement the Statement to demonstrate the State' authority to regulate water discharge facilities on non-Indian owned-land within the exterior boundaries of a reservation. We are unable to do so because the tribe's interest in regulating its environment has repeatedly been found by the EPA and the courts to outweigh the states' interests. We do believe that a question exists as to whether the Pender and Walthill WWTPs are within the exterior boundaries of the Omaha Reservation based upon a possible diminishment of the Omaha Reservation by the 1882 Act, the 1912 Act, and the current status of the land.
Sincerely,
DON STENBERG Attorney General
 Melanie J. Whittamore-Mantzios Assistant Attorney General